**TOSTRUD LAW GROUP, P.C.**
JON A. TOSTRUD (CA Bar No. 199502)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Tel: (310) 278-2600
Fax: (310) 278-2640
Email: jtostrud@tostrudlaw.com

*Attorneys for Plaintiff*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIRAJ PATEL, Derivatively on Behalf of Nominal Defendant BLOCK, INC., | |
| Plaintiff, | Case No. 25-cv-1262 |
| v. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| JACK DORSEY, ROELOF BOTHA, AMY BROOKS, SHAWN CARTER, PAUL DEIGHTON, RANDY GARUTTI, JIM MCKELVEY, MARY MEEKER, NEHA NARULA, LAWRENCE SUMMERS, DAVID VINIAR, DARREN WALKER, SHARON ROTHSTEIN, ANNA PATTERSON, and AMRITA AHUJA, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| BLOCK INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Viraj Patel ("Plaintiff"), by and through his undersigned attorneys, brings this

derivative complaint for the benefit of nominal defendant Block, Inc. ("Block" or the "Company"),

against current and former members of the Company's Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breach of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, filings with the United States Securities and Exchange Commission ("SEC"), press releases published by and regarding Block, legal filings, news reports, securities analysts' reports about the Company, the securities class action *Gonsalves v. Block, Inc., et al.,* Case No. 5:25-cv-00642-BLF (N.D. Cal.) (the "Securities Class Action"), and other publicly available information.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought by Plaintiff on behalf of Block against certain of its officers and current and former members of the Company's Board for breaches of their fiduciary duties between at least February 26, 2020 and April 30, 2024, inclusive (the "Relevant Period"), and the federal securities laws, as set forth below.

2. Block is a financial technology company, specializing in payment solutions. The Company's two primary operations are: (i) Square, a platform which enables small and medium-sized businesses ("SMBs") to use smart phones to process credit card payments; and (ii) Cash App, a consumer-focused platform that enables peer-to-peer money transfers, debit cards, savings accounts, and bitcoin investing.

3. From 2019 to 2023, Block experienced explosive growth, with its revenues growing from $1.31 billion in 2019 to $21.92 billion in 2023. Unbeknownst to the public, this rapid growth was largely driven by widespread use of the Company's platforms for illegal

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

activities.

4.      Throughout the Relevant Period, certain of the Company's officers and members of its Board issued statements that were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that, *inter alia*: (i) the Company lacked adequate customer due diligence practices and failed to adequately monitor the nature of the transactions that were being processed on the Company's platforms; (ii) Company management imposed minimal obligations on users seeking to open accounts or transact on the Company's platforms and encouraged the use of bitcoin which, together, allowed the Company to become a haven for unlawful activities; (iii) Company management ignored red flags indicating that Square and Cash App were being widely used for a variety of unlawful and unethical activities, including, *inter alia*, money laundering, child sexual abuse, sex trafficking, drug trafficking, terrorism financing, contract killings, and transactions in violation of economic sanctions; (iv) as a result of the foregoing, the Company was at heightened risk of regulatory scrutiny and reputational damage, and positive statements concerning the Company's business, operations, and prospects were materially misleading and lacked a reasonable basis at all relevant times.

5.      On March 23, 2023, Hindenburg Research published a report (the "Hindenburg Report"), alleging that Block's explosive growth was driven by "the company's willingness to facilitate fraud against consumers and the government, avoid regulation, dress up predatory loans and fees as revolutionary technology, and mislead investors with inflated metrics." The Hindenburg Report revealed that Cash App was widely used for, *inter alia*, sex trafficking, drug trafficking, consumer scams, COVID-19 relief fraud, and even contract killing payments, explaining that "Cash App's embrace of non-compliance begins by making it easy for users to get

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

on the platform, easy for them to get back on the platform if their accounts are closed, and easy to remain anonymous or operate under blatantly false identities." The Hindenburg Report further detailed interviews with former Block employees who explained that the Company systematically suppressed internal and user complaints related to rampant fraudulent and criminal activity on the Company's platforms.

6.    On this news, the price of Block stock declined 15% in one day, from a close of $72.65 per share on March 22, 2023 to a close of $61.88 per share on March 23, 2023.

7.    On August 3, 2023, the Company disclosed that the SEC and the U.S. Department of Justice ("DOJ") were investigating the allegations contained in the Hindenburg Report.

8.    On this news, the price of Block stock declined nearly 14% in one day, from a close of $73.55 per share on August 3, 2023, to a close of $63.52 per share on August 4, 2023.

9.    On February 16, 2024, *NBC News* reported that federal regulators were investigating allegations by two whistleblowers that Cash App failed to perform adequate due diligence on its customers, including by failing to implement any "effective procedure to establish the[ir] identit[ies]," leading to widespread use of the Company's platform for illicit activities. Importantly, the *NBC News* Report alleged that Company management was not only aware that the Company was failing to conduct customer due diligence, but it was intentionally failing to conduct such due diligence as a means of maximizing the opening of new customer accounts to generate more revenue.

10.    On this news, the price of Block stock declined 5% in one day, from a close of $69.48 per share on February 15, 2024, to a close of $65.64 per share on February 16, 2024.

11.    On May 1, 2024, *NBC News* reported that federal prosecutors were investigating the Company after allegations by a former employee that: (i) Block had failed to conduct basic

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

due diligence on its customers; (ii) Square had processed thousands of transactions involving countries subject to economic sanctions, including Cuba, Iran, Russia, and Venezuela; and (iii) Block had processed multiple cryptocurrency transactions for terrorist groups. The two *NBC News* reports corroborated the allegations contained in the Hindenburg Report.

12.     On this news, the price of Block stock declined 8% in one day, from a close of $73 per share on April 30, 2024, to a close of $66.84 per share on May 1, 2024.

13.     As a result of the foregoing, the Securities Class Action was filed against the Company and certain of its executive officers, exposing the Company to massive class-wide liability.

14.     In light of the breaches of fiduciary duty by the Individual Defendants, most of whom are the Company's current directors, the substantial likelihood of the directors' liability in this derivative action and the Securities Class Action, and that the Individual Defendants are beholden to each other based on their longstanding business and personal relationships, the Individual Defendants do not possess the requisite level of disinterestedness and independence to consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9) and Section 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

18.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

19.     Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Block is headquartered in this District, Defendants have conducted business in this District, and a substantial portion of the transactions and wrongs complained of herein occurred in this District.

### PARTIES

*Plaintiff*

20.     Plaintiff is, and has been at all relevant times, a shareholder of Block.

*Nominal Defendant*

21.     Nominal Defendant Block is incorporated under the laws of Delaware with its principal executive offices located at 1955 Broadway, Suite 600, Oakland, California 94612. Block's common stock is traded on the New York Stock Exchange ("NYSE") under the ticker symbol "SQ."

*Individual Defendants*

22.     Defendant Jack Dorsey ("Dorsey") co-founded the Company and has served as its Principal Executive Officer, referred to by the Company as "Block Head," and as Chairperson of the Board since 2009. Defendant Dorsey is named as a defendant in the Securities Class Action.

1
2

As of March 31, 2024, Defendant Dorsey beneficially owned 1,000,000 shares of Class A Block common stock, worth roughly $81.5 million.[1]

3
4

23.    Defendant Roelof Botha ("Botha") has served as a member of the Board since January 2011 and serves as a member of the Audit and Risk Committee (the "Audit Committee"). According to the Company's public filings, Defendant Botha received $374,618 in 2023 in compensation from the Company. As of March 31, 2024, Defendant Botha beneficially owned 1,260,452 shares of Class A Block common stock, worth roughly $102.7 million.

5
6
7
8

24.    Defendant Amy Brooks ("Brooks") has served as a member of the Board since October 2019. According to the Company's public filings, Defendant Brooks received $292,220 in 2023 in compensation from the Company. As of March 31, 2024, Defendant Brooks beneficially owned 12,780 shares of Class A Block common stock, worth roughly $1 million.

9
10
11
12

25.    Defendant Shawn Carter ("Carter") has served as a member of the Board since May 2021. According to the Company's public filings, Defendant Carter received $289,720 in 2023 in compensation from the Company. As of March 31, 2024, Defendant Carter beneficially owned 38,073 shares of Class A Block common stock, worth roughly $3.1 million.

13
14
15
16
17

26.    Defendant Paul Deighton ("Deighton") has served as a member of the Board since May 2016 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant Deighton received $314,959 in 2023 in compensation from the Company. As of March 31, 2024, Defendant Deighton beneficially owned 35,427 shares of Class A Block common stock, worth roughly $2.9 million.

18
19
20
21
22
23
24

27.    Defendant Randy Garutti ("Garutti") has served as a member of the Board since

25
26
27
28

---

[1] Valuations of the Individual Defendants' holdings of Company stock are based on the $81.46 per share closing price of Block stock on April 1, 2024.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

July 2017. According to the Company's public filings, Defendant Garutti received $299,959 in 2023 in compensation from the Company. As of March 31, 2024, Defendant Garutti beneficially owned 23,843 shares of Class A Block common stock, worth roughly $1.9 million.

28.     Defendant Jim McKelvey ("McKelvey") co-founded the Company with Defendant Dorsey and has served as a member of the Board since 2009. According to the Company's public filings, Defendant McKelvey received $289,720 in 2023 in compensation from the Company. As of March 31, 2024, Defendant McKelvey beneficially owned 131,527 shares of Class A Block common stock, worth roughly $10.7 million.

29.     Defendant Mary Meeker ("Meeker") has served as a member of the Board since June 2011. According to the Company's public filings, Defendant Meeker received $304,642 in 2023 in compensation from the Company. As of March 31, 2024, Defendant Meeker beneficially owned 413,177 shares of Class A Block common stock, worth roughly $33.7 million.

30.     Defendant Neha Narula ("Narula") has served as a member of the Board since July 2023 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant Narula received $236,125 in 2023 in compensation from the Company.

***Former Director Defendants***

31.     Defendant Lawrence Summers ("Summers") served as a member of the Board from June 2011 until February 2024. According to the Company's public filings, Defendant Summers received $299,959 in 2023 in compensation from the Company.

32.     Defendant David Viniar ("Viniar") served as a member of the Board from October 2013 until June 2022. According to the Company's public filings, Defendant Viniar received $382,102 in 2021 in compensation from the Company.

33.     Defendant Darren Walker ("Walker") served as a member of the Board from June

2020 until August 2023. According to the Company's public filings, Defendant Walker received $290,243 in 2023 in compensation from the Company.

34.     Defendant Sharon Rothstein ("Rothstein") served as a member of the Board from January 2022 until June 2024. According to the Company's public filings, Defendant Rothstein received $294,959 in 2023 in compensation from the Company.

35.     Defendant Anna Patterson ("Patterson") served as a member of the Board from November 2017 until June 2022. According to the Company's public filings, Defendant Patterson received $302,565 in 2021 in compensation from the Company.

***Officer Defendant***

36.     Defendant Amrita Ahuja ("Ahuja") has served as the Company's Chief Financial Officer ("CFO") since January 2019 and as its Chief Operating Officer ("COO") since February 2023. Defendant Ahuja is named as a defendant in the Securities Class Action. According to the Company's public filings, Defendant Ahuja received $16,548,981 in 2023 in compensation from the Company. As of March 31, 2024, Defendant Ahuja beneficially owned 330,711 shares of Class A Block common stock, worth nearly $27 million.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

37.     By reason of their positions as officers and/or directors of Block, and because of their ability to control the business and corporate affairs of Block, the Individual Defendants owed Block and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Block in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Block and its shareholders so as to benefit all shareholders equally.

38.     Each director and officer of the Company owes to Block and its shareholders the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

39.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Block, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

40.    To discharge their duties, the officers and directors of Block were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

41.    Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Block, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

42.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty: to ensure that Block implemented and properly monitored the Company's internal controls over financial reporting; to prevent the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and

present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations; and to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

43.     To discharge their duties, the officers and directors of Block were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Block were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Block's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Block conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Block and procedures for the reporting of

the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain, implement, and monitor an adequate and functioning system of internal legal, financial, and management controls, such that Block's publicly disclosed financial information would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

44.   Each of the Individual Defendants further owed to Block and the shareholders the duty of loyalty requiring that each favor Block's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

45.   At all times relevant hereto, the Individual Defendants were the agents of each other and of Block and were at all times acting within the course and scope of such agency.

46.   The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Block.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

47.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

48.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

49.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

50.    In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Block, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

51.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

52.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Block and at all times acted within the course and scope of such agency.

**BLOCK'S CODE OF CONDUCT**

53.     Block's Code of Conduct begins with a message from Defendant Dorsey, which states, in pertinent part:

> As we move Block's purpose forward together, the ethics we uphold come front and center. The Code is our framework for keeping our workplace inclusive, respectful, and compliant. Like our purpose, it helps us stay grounded as our ecosystem evolves, so be sure to follow it in your day to day.

54.     The Code of Conduct describes its purpose as follows:

> The Code is our foundation for how we work. It helps to empower everyone who works at Block to understand the responsibilities we have. It explains some of the rules we must abide by and the high standard we hold ourselves to. This Code is established by Block and is applicable globally across all Block business lines, subsidiaries, and jurisdictions.
>
> * * *
>
> If there is any conflict between this Code and applicable local law, you should comply with the most restrictive requirement.

55.     In a subsection titled "Financial Integrity & Accurate Records," the Code of Conduct states the following:

> The integrity of our business practices and financial information is paramount. Accurate, clear and complete records are essential to making the best business decisions, preserving our reputation for financial integrity and meeting our obligations as a public Company. In parallel, our shareholders and the financial markets rely on our full, fair, truthful, timely and understandable disclosures and financial information as well.

56.     In a section titled "Speak Up," the Code of Conduct states the following, in pertinent part:

> If you have a concern regarding conduct that you believe to be a violation of Company policy including this Code, a violation of law, or questionable accounting practices, internal accounting controls, or other financial matters, or the reporting of fraudulent financial information, you should speak up. No matter how small the issue is, Block wants to hear from you.
>
> * * *

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Block is committed to maintaining a work environment in which you feel free to raise any good faith concern, free of retaliation, discrimination, or harassment.

57.    In a subsection titled "Investigations," the Code of Conduct states the following, in pertinent part:

> When Block learns about a potential violation of law, this Code or any of Block's policies, the Company will take prompt action. This often includes conducting a fair, objective, and thorough investigation. When investigating, Block will make every reasonable effort to get all sides of the story in a timely, impartial way and maintain confidentiality to the fullest extent possible and in compliance with applicable laws and regulations. Note: Block requires all employees to cooperate with investigations and provide complete, accurate, and truthful information whenever asked to do so.

58.    In a section titled "Comply with Applicable Laws, Regulations, & Policies," the Code of Conduct states the following, in pertinent part:

> Competing vigorously, yet lawfully, with competitors and establishing advantageous, but fair, business relationships with customers and suppliers is a part of the foundation for long-term success. That being said, unlawful and unethical conduct, which may lead to short-term gains, would damage Block's reputation and long-term business prospects.

> * * *

> While performing work on behalf of Block, you must adhere to the Block Global Sanctions Compliance Policy, which restricts you from providing services in violation of local sanctions law.

> * * *

> You must avoid conflicts of interest, and if there is a situation that could present a potential conflict, or the appearance of conflict, you must disclose it to Block through the available channels below, so that it can be evaluated.

## BLOCK'S AUDIT COMMITTEE CHARTER

59.    Pursuant to Block's Charter of the Audit and Risk Committee (the "Audit Committee Charter"), the purpose of the Audit Committee is to assist the Board in its oversight of:

- The Company's accounting and financial reporting processes and internal controls as well as the auditing and integrity of the Company's financial statements.
- The qualifications and independence of the Company's independent registered public accounting firm (the "Independent Auditor").
- The performance of the Company's Independent Auditor and internal audit function
- The Company's compliance with applicable law (including U.S. federal securities laws and other legal and regulatory requirements).
- Risk assessment and risk management pertaining to the financial, accounting and tax matters as well as data privacy and cybersecurity needs of the Company.

60.    In a subsection titled "<u>Review Financial Statements,</u>" the Audit Committee Charter states that the Audit Committee shall "review and discuss . . . with management" the following:

- The scope and timing of the annual audit of the Company's financial statements.

- The Company's annual audited and quarterly financial statements and annual and quarterly reports on Form 10-K and 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations."

- The results of the independent audit and the quarterly reviews, and the Independent Auditor's opinion on the annual financial statements.

- The reports and certifications regarding internal control over financial reporting and disclosure controls and procedures.

- Major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles.

- Analyses prepared by management or the Independent Auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements.

- The effect of regulatory and accounting initiatives on the Company's financial statements. Any significant changes required or taken in the audit plan as a result of any material control deficiency.

61.    With respect to review of the Company's earnings releases, the Audit Committee Charter states that the Audit Committee shall "review and discuss (with particular attention to any

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

use of non-GAAP financial measures) the Company's earnings press releases, shareholder letters, and financial information and earnings guidance provided to the public, analysts and ratings agencies."

62.   With respect to the Company's internal controls, the Audit Committee Charter states the following:

> The Audit and Risk Committee shall review and discuss with management and the Independent Auditor the adequacy and effectiveness of the Company's internal controls, including any changes, significant deficiencies or material weaknesses in those controls reported by the Independent Auditor or management, any special audit steps adopted in light of significant control deficiencies, and any fraud, whether or not material, that involves management or other Company employees who have a significant role in the Company's internal controls.

> * * *

> The Audit and Risk Committee shall review and discuss the adequacy and effectiveness of the Company's disclosure controls and procedures.

63.   With respect to legal and regulatory compliance, the Audit Committee Charter tasks the Audit Committee with the following responsibilities:

- Oversee the review of any complaints and submissions that have been brought to the Audit and Risk Committee by the Company's Chief Legal Officer or Chief Compliance Officer (or equivalent titles thereof) under the Company's Code of Business Conduct and Ethics (the "Code");

- Review and discuss with management and the Independent Auditor (i) the overall adequacy and effectiveness of the Company's legal, regulatory and ethical compliance programs, including compliance with the Foreign Corrupt Practices Act and foreign anti-corruption laws, and compliance with export control regulations, (ii) any reports received through the Company's reporting hotline and (iii) reports regarding compliance with applicable laws, regulations and internal compliance programs in each case to the extent pertaining to financial, accounting and/or tax matters;

- Discuss with management and the Independent Auditor any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies; and

- Discuss with the Company's Chief Legal Officer legal matters that may have a material impact on the financial statements or the Company's compliance procedures that pertain to financial, accounting or tax matters of the Company.

64. Lastly, Audit Committee Charter states the following with respect risk oversight:

The Audit and Risk Committee shall review and discuss with management and the Independent Auditor the Company's major financial and other risk exposures, particularly financial reporting, tax, accounting, disclosure controls and procedures, internal control over financial reporting, investment guidelines and credit and liquidity matters, the Company's programs, policies relating to legal and regulatory compliance, and operational security and reliability, and the steps management has taken to monitor and control those exposures, including the Company's guidelines and policies with respect to risk assessment and risk management. The Audit and Risk Committee will also review the Company's risk management framework, programs, and policies, as well as the framework by which management discusses the Company's risk prole and risk exposures with the Board and its committees.

## **SUBSTANTIVE ALLEGATIONS**

### *Background of the Company*

65. Block is a financial technology company, specializing in payment solutions. The Company's two primary operations are: (i) Square, a platform which enables SMBs to use smart phones to process credit card payments; and (ii) Cash App, a consumer-focused platform that enables peer-to-peer money transfers, debit cards, savings accounts, and bitcoin investing.

### *Cash App Begins Accepting Bitcoin Transactions*

66. Bitcoin operates on a decentralized network called the blockchain. A blockchain is essentially a digital database that can publicly record and store transactions. Blockchains distribute information among nodes of a computer network to create a secure and decentralized record of transactions.

67. While transactions recorded on the blockchain are visible to the public, the transactions are not labeled with any information to identify the individuals involved in the transaction. Instead, the transactions are labeled with randomly generated strings of characters

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

associated with the particular digital wallet involved with the transaction.

68.    Accordingly, bitcoin transactions are widely understood as providing a higher degree of anonymity, relative to transactions that involve traditional banking. Bitcoin transactions are not completely anonymous, however, as it is possible, with careful analysis, to connect the identifying string of characters to a particular person. Furthermore, a platform accepting bitcoin transactions can require users to undergo a robust identify verification process so that transactions associated with a particular account can be definitively linked to its user. Accordingly, it is crucial for a Company accepting bitcoin transactions to conduct vigorous customer due diligence in order to effectively monitor transactions on its platform and to ensure that the platform is not being used for unlawful and/or unethical purposes.

69.    In 2018, Cash App began accepting bitcoin transactions. Since then, Block has experienced rapid growth, with yearly revenues growing 1,500% in four years, from $1.31 billion in 2019 to $21.92 billion in 2023. The Individual Defendants largely attributed this explosive growth to Cash App's ease of use and the Company's ability to reach unbanked communities. For instance, a description of Cash App, published on the Company's website, characterizes the platform as a means "to redefine the world's relationship with money by making it more relatable, instantly available, and universally accessible."

70.    In reality, the Company's monumental growth was largely fueled by the Individual Defendants' disregard for the Company's regulatory compliance obligations. Specifically, the Individual Defendants ignored numerous red flags, including user complaints and internal reports from Company employees, which indicated that Cash App had become a safe haven for criminals seeking to engage in illegal activities. In fact, during the Relevant Period, the Individual Defendants ignored indications that the Company's products were used for, *inter alia*, money

laundering, child sexual abuse, sex trafficking, drug trafficking, terrorism financing, contract killings, and transactions in violation of economic sanctions.

***False and Misleading Statements During the Relevant Period***

71.     On February 26, 2020, the Company issued a shareholder letter, announcing fourth quarter and full-year 2019 financial results (the "FY19 Letter"). With respect to fourth quarter results, the FY19 Letter reported $1.31 billion in net revenue and $527 million in gross profit, representing 41% and 39% year-over-year growth, respectively. Regarding full-year results, the FY19 Letter reported $4.71 billion in revenues and $1.89 billion in gross profit, representing 43% and 45% year-over-year growth, respectively. Breaking down the Company's results into its two primary operations, the FY19 Letter reported $938 million in revenues and $379 million in gross profits for Square during the quarter, representing 26% and 27% percent year-over-year growth, respectively. For Cash App, the FY19 Letter reported $361 million in revenues and $144 million in gross profit for the quarter, representing 147% and 104% year-over-year growth, respectively. The FY19 Letter further reported 24 million monthly active users for Cash App, representing 60% year-over-year growth.

72.     The same day, the Company filed its 2019 annual report on Form 10-K with the SEC (the "2019 10-K"), which was signed by Defendants Dorsey, Ahuja, Botha, Brooks, Deighton, Garutti, McKelvey, Meeker, Patterson, Summers, and Viniar. The 2019 10-K repeated the financial results that were reported in the FY19 Letter. The 2019 10-K further represented that the Company had established and implemented a "compliance program focused on the laws, rules, and regulations applicable to [its] business" and that Block and its employees "vet and monitor [the Company's] customers and the payments transactions we process for them as part of our risk management efforts." The 2019 10-K further stated the following regarding the Company's

purported efforts to comply with applicable anti-money laundering laws and regulations:

> We are subject to anti-money laundering (AML) laws and regulations in the United States and other jurisdictions. ***We have implemented an AML program designed to prevent our payments network from being used to facilitate money laundering, terrorist financing, and other illicit activity. Our program is also designed to prevent our network from being used to facilitate business in countries, or with persons or entities, included on designated lists promulgated by the U.S. Department of the Treasury's Office of Foreign Assets Controls and equivalent applicable foreign authorities. Our AML compliance program includes policies, procedures, reporting protocols, and internal controls, including the designation of an AML compliance officer, and is designed to address these legal and regulatory requirements and to assist in managing risk associated with money laundering and terrorist financing.[2]***

73.     On May 6, 2020, the Company issued a shareholder letter, announcing its first quarter 2020 financial results (the "1Q20 Letter"). The 1Q20 Letter reported $1.38 billion in net revenue and $539 million in gross profit for the quarter, representing 44% and 36% year-over-year growth, respectively. For Square, the 1Q20 Letter reported $853 million in revenues and $356 million in gross profits for the quarter, representing 16% and 18% percent year-over-year growth, respectively. For Cash App, the 1Q20 Letter reported $528 million in revenues and $183 million in gross profit for the quarter, representing 197% and 115% year-over-year growth, respectively. The 1Q20 Letter further stated that, in April, "Cash App delivered strong revenue and gross profit growth year over year, and achieved its highest monthly totals for net-new transacting active customers, peer-to-peer volumes, Cash Card spend, Cash Card orders, direct deposit transacting active customers, bitcoin volumes, stock brokerage volumes, and stored funds."

74.     The same day, the Company filed a quarterly report on Form 10-Q with the SEC for the first quarter of 2020 (the "1Q20 10-Q"), which repeated the financial results that were reported in the 1Q20 Letter. The 1Q20 10-Q also repeated the same misleading statements

---

[2] Unless indicated otherwise, all emphasis is added.

regarding the Company's legal compliance and customer due diligence that were contained in the 2019 10-K. Specifically, the 1Q20 10-Q represented that the Company had established and implemented a "compliance program focused on the laws, rules, and regulations applicable to [its] business" and that Block and its employees "vet and monitor [the Company's] customers and the payments transactions we process for them as part of our risk management efforts."

75.    On August 4, 2020, the Company issued a shareholder letter, announcing its second quarter 2020 financial results (the "2Q20 Letter"). The 2Q20 Letter reported $1.92 billion in net revenue and $597 million in gross profit for the quarter, representing 64% and 28% year-over-year growth, respectively. For Square, the 2Q20 Letter reported $723 million in revenues and $316 million in gross profits. For Cash App, the 2Q20 Letter reported $1.2 billion in revenues and $281 million in gross profit, representing 361% and 167% year-over-year growth, respectively. The 2Q20 Letter further stated that, in June, "Cash App had more than 30 million monthly transacting active customers, with more than 7 million spending on Cash Card."

76.    The following day, the Company filed a quarterly report on Form 10-Q with the SEC for the second quarter of 2020 (the "2Q20 10-Q"), which repeated the financial results that were reported in the 2Q20 Letter. The 2Q20 10-Q also repeated the same misleading statements regarding the Company's legal compliance and customer due diligence that were contained in the 2019 10-K.

77.    On November 5, 2020, the Company issued a shareholder letter, announcing its third quarter 2020 financial results (the "3Q20 Letter"). The 3Q20 Letter reported $3.03 billion in net revenue and $794 million in gross profit for the quarter, representing 140% and 59% year-over-year growth, respectively. For Square, the 3Q20 Letter reported $965 million in revenues and $409 million in gross profits for the quarter, representing 5% and 12% year-over-year growth,

respectively. For Cash App, the 3Q20 Letter reported $2.07 billion in revenues and $385 million in gross profit for the quarter, representing 574% and 212% year-over-year growth, respectively. The 3Q20 Letter further stated that, during the quarter, "the number of average daily transacting active Cash App customers nearly doubled from the same period last year."

78.    The same day, the Company filed a quarterly report on Form 10-Q with the SEC for the third quarter of 2020 (the "3Q20 10-Q"), which repeated the financial results that were reported in the 3Q20 Letter. The 3Q20 10-Q also repeated the same misleading statements regarding the Company's legal compliance and customer due diligence that were contained in the 2019 10-K.

79.    On January 4, 2021, the Company issued a press release, opposing regulations proposed by the U.S. Department of the Treasury's Financial Enforcement Network to enhance due diligence requirements for companies processing cryptocurrency transactions. The press release stated that one of Block's "core principles" was "that people should have the ability to participate in financial systems easily and equitably." The press release claimed that, as Square had "invested substantially in the health of its ecosystem from a product, leadership, innovation, and legal perspective," the proposed regulations were actually "unnecessary." The press release further claimed that the proposed regulations would actually heighten the incidence of unlawful activities and that "private sector solutions and companies" were better positioned to mitigate such risks. As an example, the press release explained that Square was "able to use data that is available through blockchain analysis to identify signals of unlawful activity." The press release represented that Block's initiatives and coordination with regulators had "prove[n] extraordinarily effective in identifying and stopping illicit activities."

80.    On February 23, 2021, the Company issued a shareholder letter, announcing fourth

quarter and full-year 2020 financial results (the "FY20 Letter"). With respect to fourth quarter results, the FY20 Letter reported $3.16 billion in net revenue and $804 million in gross profit, representing 141% and 52% year-over-year growth, respectively. Regarding full-year results, the FY20 Letter reported $9.5 billion in revenues and $2.73 billion in gross profit, representing 101% and 45% year-over-year growth, respectively. For Square, the FY20 Letter reported $987 million in revenues and $427 million in gross profits during the quarter, representing 5% and 13% percent year-over-year growth, respectively. For Cash App, the FY20 Letter reported $2.17 billion in revenues and $377 million in gross profit for the quarter, representing 502% and 162% year-over-year growth, respectively. The FY20 Letter further stated that "Cash App continued to drive strong acquisition of new customers and retain its existing base: In December, Cash App had more than 36 million monthly transacting active customers, up more than 50% year over year."

81.     The same day, the Company filed its 2020 annual report on Form 10-K with the SEC (the "2020 10-K"), which was signed by Defendants Dorsey, Ahuja, Botha, Brooks, Deighton, Garutti, McKelvey, Meeker, Patterson, Summers, Viniar, and Walker. The 2020 10-K repeated the financial results that were reported in the FY20 Letter. The 2020 10-K also repeated the same misleading statements regarding the Company's legal compliance and customer due diligence that were contained in the 2019 10-K. The 2020 10-K further repeated the misleading statement regarding the Company's compliance with applicable anti-money laundering laws and regulations that was contained in the 2019 10-K.

82.     On May 6, 2021, the Company issued a shareholder letter, announcing its first quarter 2021 financial results (the "1Q21 Letter"). The 1Q21 Letter reported $5.06 billion in net revenue and $964 million in gross profit for the quarter, representing 266% and 79% year-over-year growth, respectively. For Square, the 1Q21 Letter reported $1.02 billion in revenues and $468

million in gross profits for the quarter, representing 19% and 32% year-over-year growth, respectively. For Cash App, the 1Q21 Letter reported $4.04 billion in revenues and $495 million in gross profit for the quarter, representing 666% and 171% year-over-year growth, respectively. The 1Q21 Letter further stated that Block "continued to drive acquisition of net-new transacting active Cash App customers as well as engagement with Cash Card, Boost, direct deposit, stock brokerage, bitcoin investing, and business accounts."

83.    The same day, the Company filed a quarterly report on Form 10-Q with the SEC for the first quarter of 2021 (the "1Q21 10-Q"), which repeated the financial results that were reported in the 1Q21 Letter. The 1Q21 10-Q also repeated the same misleading statements regarding the Company's legal compliance and customer due diligence that were contained in the 2019 10-K.

84.    On August 1, 2021, the Company issued a shareholder letter, announcing its second quarter 2021 financial results (the "2Q21 Letter"). The 2Q21 Letter reported $4.68 billion in net revenue and $1.14 billion in gross profit for the quarter, representing 143% and 91% year-over-year growth, respectively. For Square, the 2Q21 Letter reported $1.31 billion in revenues and $585 million in gross profits for the quarter, representing 81% and 85% year-over-year growth, respectively. For Cash App, the 2Q21 Letter reported $3.33 billion in revenues and $546 million in gross profit for the quarter, representing 177% and 94% year-over-year growth, respectively. The 2Q21 Letter further stated that, during the quarter, "volume sent through Cash App's network increased by nearly 4x compared to two years ago, driven by growth in existing customers and newer customers transacting more frequently."

85.    The following day, the Company filed a quarterly report on Form 10-Q with the SEC for the second quarter of 2021 (the "2Q21 10-Q"), which repeated the financial results that

were reported in the 2Q21 Letter. The 2Q21 10-Q also repeated the same misleading statements regarding the Company's legal compliance and customer due diligence that were contained in the 2019 10-K.

86.    On November 4, 2021, the Company issued a shareholder letter, announcing its third quarter 2021 financial results (the "3Q21 Letter"). The 3Q21 Letter reported $3.84 billion in net revenue and $1.13 billion in gross profit for the quarter, representing 27% and 43% year-over-year growth, respectively. For Square, the 3Q21 Letter reported $1.39 billion in revenues and $606 million in gross profits for the quarter, representing 44% and 48% year-over-year growth, respectively. For Cash App, the 3Q21 Letter reported $2.39 billion in revenues and $512 million in gross profit for the quarter, representing 16% and 33% year-over-year growth, respectively. The 3Q21 Letter further stated that, in October, "we expect Cash App to deliver strong gross profit growth year over year and on a two-year CAGR basis driven by growth in monthly actives, engagement across our ecosystem, and inflows into Cash App."

87.    The same day, the Company filed a quarterly report on Form 10-Q with the SEC for the third quarter of 2021 (the "3Q21 10-Q"), which repeated the financial results that were reported in the 3Q21 Letter. The 3Q21 10-Q also repeated the same misleading statements regarding the Company's legal compliance and customer due diligence that were contained in the 2019 10-K.

88.    On February 24, 2022, the Company issued a shareholder letter, announcing fourth quarter and full-year 2021 financial results (the "FY21 Letter"). With respect to fourth quarter results, the FY21 Letter reported $4.08 billion in net revenue and $1.18 billion in gross profit, representing 29% and 47% year-over-year growth, respectively. Regarding full-year results, the FY21 Letter reported $17.66 billion in revenues and $4.42 billion in gross profit, representing 86%

and 62% year-over-year growth, respectively. For Square, the FY21 Letter reported $1.47 billion in revenues and $657 million gross profits during the quarter, representing 49% and 54% percent year-over-year growth, respectively. For Cash App, the FY21 Letter reported $2.55 billion in revenues and $518 million in gross profit for the quarter, representing 18% and 37% year-over-year growth, respectively. The FY21 Letter further stated that "[w]e drove growth in net new transacting actives and strong engagement across products in our Cash App ecosystem."

89.    The same day, during the Company's fourth quarter earnings call, Defendant Dorsey stated the following with respect to Block's compliance efforts:

> ***I'll say that I think our biggest constraint right now is just how we think about building Cash App's risk and compliance efforts, everything that we see around fraud.*** We want to make sure that we are building a system that is scalable, that allows for limits for customers who might have more resources at their disposal and want to use Cash App for more and more things such as – as they would treat their normal bank.
>
> ***So we have limits in place to manage all these things, and a big goal for us is to make sure that we're looking for opportunities to increase those and to, at the same time, maintain all of the risk controls and fraud and continue to do what we've done so well over the years. And not just on the Cash App side, but on the Square side, keep it in our business forever.***

90.    Also of February 24, 2022, the Company filed its 2021 annual report on Form 10-K with the SEC (the "2021 10-K"), which was signed by Defendants Dorsey, Ahuja, Botha, Brooks, Carter, Deighton, Garutti, McKelvey, Meeker, Narula, and Rothstein. The 2021 10-K repeated the financial results that were reported in the FY21 Letter. The 2021 10-K also repeated the same misleading statements regarding the Company's legal compliance and customer due diligence that were contained in the 2019 10-K. The 2021 10-K further repeated the misleading statement regarding the Company's compliance with applicable anti-money laundering laws and regulations that was contained in the 2019 10-K.

91.    On April 28, 2022, Block filed a proxy statement on Form DEF 14A with the SEC

(the "2022 Proxy"), soliciting shareholder approval for, *inter alia*, the re-election of Defendants Dorsey and Deighton to serve for another three-year term on the Board and the compensation of certain of the Company's executive officers, including Defendants Dorsey and Ahuja.

92.    The 2022 Proxy touted the Company's "[s]trong risk oversight by [the] full board and committees." The 2022 Proxy continued, stating the following regarding the Company's risk management function:

> Our board of directors recognizes the oversight of risk management as one of its primary responsibilities and central to maintaining an effective, risk aware and accountable organization. The oversight responsibility of our board of directors and its committees is enabled by management reporting processes that are designed to provide visibility to our board of directors regarding the identification, assessment and management of risks and management's strategic approach to risk mitigation. Our Lead Independent Director and Chair of our audit and risk committee meets with our Internal Audit Lead, Chief Financial Officer, Chief Compliance Officer and Chief Legal Officer on a regular cadence to identify and discuss risks and exposures and escalates potential issues to our audit and risk committee or board of directors, as appropriate.

> As part of our overall risk management process, we conduct an Enterprise Risk Assessment ("ERA") on an annual basis, which is shared and discussed with our board of directors. The oversight of the ERA is supported and enabled by our audit and risk committee. In addition, our board of directors' responsibilities related to oversight of the ERA framework include a routine evaluation of the processes, as well as discussions with key management and representatives of outside advisors as appropriate, used to identify, assess, monitor and report on risks across the organization and the setting and communication of the organization's implementation and measurement of risk tolerances, limits and mitigation. These primary risk focus areas are defined by the board of directors, management and leaders of our ERA review as strategic, operational, people, financial and compliance and consist of risks such as cybersecurity, financial reporting and competition.

> While our board of directors maintains ultimate responsibility for the oversight of risk, it has implemented a multi-layered approach which delegates certain responsibilities to the appropriate board committees to ensure that these primary areas of focus are thoroughly discussed and that a pervasive understanding of such focus areas is obtained. Our board of directors and its committees oversee risks associated with their respective areas of responsibility, as summarized below. Each board committee meets in executive session with key management personnel and

representatives of outside advisors as required or requested. Our board of directors may delegate additional risk areas in the future.

93.    The 2022 Proxy specifies that the Audit Committee is responsible for oversight over the following types of risk:

> Risks and exposures associated with financial matters, particularly financial reporting, tax, accounting, disclosure controls and procedures, internal control over financial reporting, investment guidelines and credit and liquidity matters, our programs and policies relating to legal and regulatory compliance, data privacy, data security, cybersecurity and operational security and reliability, as well as matters of risk related to Square Financial Services.

94.    On May 5, 2022, the Company issued a shareholder letter, announcing its first quarter 2022 financial results (the "1Q22 Letter"). The 1Q22 Letter reported $3.96 billion in net revenue and $1.29 billion in gross profit for the quarter, representing a 22% decline and a 34% increase year-over-year, respectively. The year-over-year decline in net revenue was attributable to a decrease in bitcoin revenue. For Square, the 1Q22 Letter reported $1.44 billion in revenues and $661 million in gross profits for the quarter, representing 42% and 41% year-over-year growth, respectively. For Cash App, the 1Q22 Letter reported $2.46 billion in revenues and 26% year-over-year growth in gross profit to $624 million for the quarter. The 1Q22 Letter further stated that "[w]e are focused on expanding our customers' awareness and access to bitcoin, which has allowed us to drive meaningful adoption: As of the end of the first quarter, more than 10 million Cash App accounts have bought bitcoin since the product was introduced."

95.    On the same day, the Company filed a quarterly report on Form 10-Q with the SEC for the first quarter of 2022 (the "1Q22 10-Q"), which repeated the financial results that were reported in the 1Q22 Letter. The 1Q22 10-Q also repeated the same misleading statements regarding the Company's legal compliance and customer due diligence that were contained in the 2019 10-K.

96.    On August 4, 2022, the Company issued a shareholder letter, announcing its second quarter 2022 financial results (the "2Q22 Letter"). The 2Q22 Letter reported $4.4 billion in net revenue and $1.47 billion in gross profit for the quarter, representing a 6% decline and a 29% increase year-over-year, respectively. For Square, the 2Q22 Letter reported $1.73 billion in revenues and $755 million in gross profits for the quarter, representing 32% and 29% year-over-year growth, respectively. For Cash App, the 2Q22 Letter reported $2.62 billion in revenues and 29% year-over-year growth in gross profit to $705 million for the quarter. The 2Q22 Letter further stated that "[w]e drove growth in net new transacting actives and strong engagement across products in our Cash App ecosystem, such that overall inflows grew quarter over quarter and year over year."

97.    On the same day, the Company filed a quarterly report on Form 10-Q with the SEC for the second quarter of 2022 (the "2Q22 10-Q"), which repeated the financial results that were reported in the 2Q22 Letter. The 2Q22 10-Q also repeated the same misleading statements regarding the Company's legal compliance and customer due diligence that were contained in the 2019 10-K.

98.    On November 3, 2022, the Company issued a shareholder letter, announcing its third quarter 2022 financial results (the "3Q22 Letter"). The 3Q22 Letter reported $4.52 billion in net revenue and $1.57 billion in gross profit, representing 17% and 38% year-over-year growth, respectively. For Square, the 3Q22 Letter reported $1.77 billion in revenues and $783 million gross profits during the quarter, representing 27% and 29% percent year-over-year growth, respectively. For Cash App, the 3Q22 Letter reported $2.68 billion in revenues and $774 million in gross profit for the quarter, representing 12% and 51% year-over-year growth, respectively. The 3Q22 Letter further stated that "[w]e drove growth in net new transacting actives and strong engagement across

products in our Cash App ecosystem."

99.    On the same day, the Company filed a quarterly report on Form 10-Q with the SEC for the third quarter of 2022 (the "3Q22 10-Q"), which repeated the financial results that were reported in the 3Q22 Letter. The 3Q22 10-Q also repeated the same misleading statements regarding the Company's legal compliance and customer due diligence that were contained in the 2019 10-K.

100.    On February 23, 2023, the Company issued a shareholder letter, announcing fourth quarter and full-year 2022 financial results (the "FY22 Letter"). With respect to fourth quarter results, the FY22 Letter reported $4.65 billion in net revenue and $1.66 billion in gross profit, representing 14% and 40% year-over-year growth, respectively. Regarding full-year results, the FY22 Letter reported $17.53 billion in revenues and a 36% year-over-year increase in gross profit to $5.99 billion. For Square, the FY22 Letter reported $1.76 billion in revenues and $801 million gross profits during the quarter, representing 19% and 22% percent year-over-year growth, respectively. For Cash App, the FY22 Letter reported $2.68 billion in revenues and $848 million in gross profit for the quarter, representing 12% and 64% year-over-year growth, respectively. The FY21 Letter further stated that Block "ended the year with 51 million monthly transacting actives in December, with two out of three transacting each week on average."

101.    The same day, the Company filed its 2022 annual report on Form 10-K with the SEC (the "2022 10-K"), which was signed by Defendants Dorsey, Ahuja, Botha, Brooks, Carter, Deighton, Garutti, McKelvey, Meeker, Rothstein, Summers, and Walker. The 2022 10-K repeated the financial results that were reported in the FY22 Letter. The 2022 10-K also repeated the same misleading statements regarding the Company's legal compliance and customer due diligence that were contained in the 2019 10-K. The 2022 10-K further repeated the misleading statement

regarding the Company's compliance with applicable anti-money laundering laws and regulations that was contained in the 2019 10-K.

102.    The statements identified above were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) the Individual Defendants failed to conduct basic due diligence regarding its customers' identities or the nature of the transactions that were being processed on the Company's platforms; (ii) by imposing minimal obligations on users seeking to open accounts or transact on the Company's platform and by encouraging the use of bitcoin, the Individual Defendants allowed the Company to become a haven for unlawful and unethical activities; (iii) the Individual Defendants ignored red flags indicating that Square and Cash App were being widely used for a variety of illicit activities, including, *inter alia*, money laundering, child sexual abuse, sex trafficking, drug trafficking, terrorism financing, contract killings, and transactions in violation of economic sanctions; (iv) users of the Company's platforms could open multiple accounts using fake identities, leaving the platforms highly susceptible to use for fraudulent and/or illicit activities; (v) Block allowed customers to withdraw funds even after the account had been flagged for potentially illegal activities; (vi) publicly reported data regarding monthly Cash App users was artificially inflated due to the prevalence of fake accounts and the ability of bad actors to open multiple accounts; (vii) despite descriptions of the Board's and its committees' oversight responsibilities with respect to risk management and internal controls, the Board and its committees were not adequately fulfilling these responsibilities and were causing or permitting the Company to issue false and misleading statements; and (viii) as a result of the foregoing, the Company was at heightened risk of regulatory scrutiny and reputational damage, and positive statements concerning the Company's business, operations, and prospects were materially

misleading and lacked a reasonable basis at all relevant times.

***The Truth Gradually Emerges as the Individual Defendants Continue to Issue False and Misleading Statements***

103.    On March 23, 2023, Hindenburg Research published a report titled "Block: How Inflated User Metrics and 'Frictionless' Fraud Facilitation Enabled Insiders to Cash Out Over $1 Billion." The Hindenburg Report, a result of a two-year investigation that included interviews with dozens of former Block employees, partners, and industry experts, concluded that Block's explosive growth was driven by "the company's willingness to facilitate fraud against consumers and the government, avoid regulation, dress up predatory loans and fees as revolutionary technology, and mislead investors with inflated metrics." The Hindenburg Report characterized Cash App as the "Wild West" and highlighted the Company's disregard for its compliance obligations as having made it "easy for bad actors to mass-create accounts for identity fraud and other scams, then extract stolen funds quickly." The Hindenburg Report revealed that Cash App was widely used for, *inter alia*, sex trafficking, drug trafficking, consumer scams, COVID-19 relief fraud, and even contract killing payments, explaining that "Cash App's embrace of non-compliance begins by making it easy for users to get on the platform, easy for them to get back on the platform if their accounts are closed, and easy to remain anonymous or operate under blatantly false identities." The Hindenburg Report further detailed interviews with former Block employees who recalled the Company systematically suppressing internal concerns and ignoring user complaints related to rampant fraudulent and criminal activity on the platform.

104.    On this news, the price of Block stock declined 15% in one day, from a close of $72.65 per share on March 22, 2023 to a close of $61.88 per share on March 23, 2023. However, the price of Block stock remained artificially inflated as the Individual Defendants continued to obscure the truth. Hours after the release of the Hindenburg Report, the Company issued and press

release, denying the allegations contained therein and stating the following, in relevant part:

> ***We intend to work with the SEC and explore legal action against Hindenburg Research for the factually inaccurate and misleading report they shared about our Cash App business today.***
>
> Hindenburg is known for these types of attacks, which are designed solely to allow short sellers to profit from a declined stock price. ***We have reviewed the full report in the context of our own data and believe it's designed to deceive and confuse investors.***
>
> ***We are a highly regulated public company with regular disclosures, and are confident in our products, reporting, compliance programs, and controls*** will not be distracted by typical short seller tactics.

105.    On May 4, 2023, the Company issued a shareholder letter, announcing its first quarter 2023 financial results (the "1Q23 Letter"). The 1Q23 Letter reported $4.99 billion in net revenue and $1.71 billion in gross profit, representing 26% and 32% year-over-year growth, respectively. For Square, the 1Q23 Letter reported $1.67 billion in revenues and $770 million gross profits during the quarter, representing 15% and 16% percent year-over-year growth, respectively. For Cash App, the 1Q23 Letter reported $3.27 billion in revenues and $931 million in gross profit for the quarter, representing 33% and 49% year-over-year growth, respectively. The 1Q23 Letter further stated that "[w]e drove growth in net new transacting actives and strong engagement across products in our Cash App ecosystem."

106.    The same day, during the Company's third quarter 2022 earnings call, Defendant Dorsey stated the following regarding the allegations in the Hindenburg Report: "I would say that we stand by our response to the shareholder report. . . . [Our] regulators trust us as well. So this is a significant focus for us and always has been." Defendant Ahuja then touted the Company's "culture of compliance and responsible risk management," stating the following:

> Block operates a business that is highly regulated, and our goal is ultimately to expand access to the economy through intuitive financial products. In order to do that, ***we must maintain a culture of compliance and responsible risk***

*management, including through investment in programs, processes, controls and teams with deep compliance expertise, prioritizing compliance ultimately helps us drive trust to their customers with regulators and external partners, and that enables us to then develop innovative products responsibly. We have significantly grown our investment in compliance over the last few years.*

107.    Also on May 4, 2023, the Company filed a quarterly report on Form 10-Q with the SEC for the first quarter of 2023 (the "1Q23 10-Q"), which repeated the financial results that were reported in the 1Q23 Letter. The 1Q23 10-Q also repeated the same misleading statements regarding the Company's legal compliance and customer due diligence that were contained in the 2019 10-K.

108.    On August 3, 2023, the Company issued a shareholder letter, announcing its second quarter 2023 financial results (the "2Q23 Letter"). The 2Q23 Letter reported $5.53 billion in net revenue and $1.87 billion in gross profit, representing 26% and 27% year-over-year growth, respectively. For Square, the 2Q23 Letter reported $1.93 billion in revenues and $888 million gross profits during the quarter, representing 12% and 18% percent year-over-year growth, respectively. For Cash App, the 2Q23 Letter reported $3.56 billion in revenues and $968 million in gross profit for the quarter, representing 36% and 37% year-over-year growth, respectively. The 2Q23 Letter further stated that "[w]e drove growth in net new transacting actives and strong engagement across products in our Cash App ecosystem."

109.    The same day, the Company filed a quarterly report on Form 10-Q with the SEC for the second quarter of 2023 (the "2Q23 10-Q"), which repeated the financial results that were reported in the 2Q23 Letter. The 2Q23 10-Q also repeated the same misleading statements regarding the Company's legal compliance and customer due diligence that were contained in the 2019 10-K. The 2Q23 10-Q additionally disclosed that the SEC and the DOJ were investigating the allegations contained in the Hindenburg Report.

110.    On this news, the price of Block stock declined nearly 14% in one day, from a close of $73.55 per share on August 3, 2023, to a close of $63.52 per share on August 4, 2023.

111.    On November 4, 2023, the Company issued a shareholder letter, announcing its third quarter 2023 financial results (the "3Q23 Letter"). The 3Q23 Letter reported $5.62 billion in net revenue and $1.9 billion in gross profit, representing 24% and 21% year-over-year growth, respectively. For Square, the 3Q23 Letter reported $1.98 billion in revenues and $899 million gross profits during the quarter, representing 12% and 15% percent year-over-year growth, respectively. For Cash App, the 3Q23 Letter reported $3.58 billion in revenues and $984 million in gross profit for the quarter, representing 34% and 27% year-over-year growth, respectively. The 3Q23 Letter further stated that, in September, "Cash App had 55 million monthly transacting actives, up 11% year over year."

112.    The same day, the Company filed a quarterly report on Form 10-Q with the SEC for the third quarter of 2023 (the "3Q23 10-Q"), which repeated the financial results that were reported in the 3Q23 Letter. The 3Q23 10-Q also repeated the same misleading statements regarding the Company's legal compliance and customer due diligence that were contained in the 2019 10-K.

113.    On February 16, 2024, *NBC News* reported that federal regulators were investigating allegations by two whistleblowers that Cash App failed to perform adequate due diligence on its customers, including by failing to implement any "effective procedure to establish the[ir] identity." The whistleblowers detailed Cash App transactions with entities that were under sanction by the U.S. Department of the Treasury's Office of Foreign Assets Control, operations known to commit fraud and identity theft, and illegal offshore gambling operations. The whistleblowers characterized Block as operating "'a shadow financial system beyond the reach of

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

regulators.'" According to the report, Cash App pressured its banking partners to forgo traditional due diligence with the express purpose of facilitating the opening of more accounts to generate more revenues. Further, the Company took steps to obscure transactions from its banking partners to prevent those partners from being able to effectively identify illegal activities.

114.    On this news, the price of Block stock declined 5% in one day, from a close of $69.48 per share on February 15, 2024, to a close of $65.64 per share on February 16, 2024.

115.    On May 1, 2024, *NBC News* reported that federal prosecutors were investigating the Company after allegations by a former employee that: (i) Block had failed to conduct basic due diligence on its customers; (ii) Square had processed thousands of transactions involving countries subject to economic sanctions, including Cuba, Iran, Russia, and Venezuela; and (iii) Block had processed multiple cryptocurrency transactions for terrorist groups. The report further stated that Block failed to properly report transactions to U.S. regulatory authorities and failed to address compliance deficiencies even after being notified. According to the former employee, the compliance violations at the Company were widely understood by both senior executives and the Board, and "[f]rom the ground up, everything in the compliance section was flawed . . . . It is led by people who should not be in charge of a regulated compliance program." The report further explained that customers subject to a sanctions alert were still permitted to withdraw funds before the review was complete, rendering already-deficient compliance practices completely useless.

116.    On this news, the price of Block stock declined 8% in one day, from a close of $73 per share on April 30, 2024, to a close of $66.84 per share on May 1, 2024.

***Post-Relevant Period Disclosures***

117.    On January 15, 2025, a coalition of 48 state regulatory agencies announced that Block had agreed to pay $80 million for violations of the Bank Secrecy Act and Anti-Money

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Laundering laws.

118.    On January 16, 2025, the Consumer Financial Protection Bureau ("CFPB") ordered Block to refund customers up to $120 million and to pay an additional fine of $55 million into the CFPB's victims relief fund, finding that the Company employed inadequate security protocols for Cash App that put users at heightened risk of fraud. CFPB further found that Block failed to maintain meaningful customer service, causing customers to seek alternative routes to Cash App customer service through web searches, leaving these customers vulnerable to fraud perpetrated by bad actors posing as Cash App representatives.

***Stock Repurchases During the Relevant Period***

119.    According to the Company's public filings, while the price of Company stock was artificially inflated due to the false and misleading statements detailed herein, the Individual Defendants caused the Company to repurchase more than 7 million shares of its own stock, for a total of roughly $506 million.

120.    Specifically, the Company repurchased 7,316,000 shares for $506,087,590 between November 1, 2023 and April 30, 2024.

121.    Given that the price of Block stock was $66.84 after the corrective disclosures on May 1, 2024, the true value of the 7,316,000 repurchased shares was roughly $489 million. Accordingly, the Individual Defendants caused the Company to overpay by approximately $17 million to repurchase these shares.

## DAMAGE TO THE COMPANY

122.    As a direct and proximate result of the misconduct detailed above, the Company has incurred and will continue to incur significant financial losses, including but not limited to, the costs of defending against and incurring potential class-wide liability in the Securities Class

Action.

123.    These damages also include the costs of remediating deficiencies in the Company's procedures and controls, the payment of fines and penalties to regulatory agencies for violations of applicable laws and regulations, the payment of refunds to customers who were victims of fraud resulting from the Company's inadequate security protocols, and compensation and benefits paid to current and former members of the Board and Company executives, who breached their fiduciary duties to Block.

124.    Furthermore, as a direct and proximate result of the misconduct detailed herein, Block has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and management's breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

125.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breach of fiduciary duties by the Individual Defendants.

126.    Block is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

127.    Plaintiff is a current shareholder of Block and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

128.    A pre-suit demand on the Board of Block is futile and, therefore, excused. At the time this action was commenced, the nine-member Board was comprised of Defendants Botha,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Brooks, Carter, Deighton, Dorsey, Garutti, McKelvey, Meeker, and Narula (the "Director Defendants"). Accordingly, Plaintiff is only required to show that five Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Board's current members are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

129. The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

130. Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

131. Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

132. Defendant Dorsey is not disinterested or independent and is therefore incapable of considering a demand. Defendant Dorsey has served as the Company's Principal Executive Officer since its inception. Accordingly, the Company admits that Defendant Dorsey is not independent pursuant to NYSE listing standards.

133. Further, Defendants Dorsey and McKelvey are not disinterested or independent

because, as co-founders of the Company, Defendants Dorsey and McKelvey cannot be reasonably expected to consider with disinterestedness whether to sue fellow directors of a company that they founded and have helped to build from inception.

134.    Furthermore, Defendant Dorsey is not disinterested or independent because he is named as a defendant, and faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

135.    Defendants Deighton and Narula served on the Company's Audit Committee during the Relevant Period (the "Audit Defendants") and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial accounting and reporting, the underlying internal controls and procedures over financial reporting, and the audits of the financial statements. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business and the adequacy of its internal controls as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

136.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Directors to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make

the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

137.    All of the Board's current members derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the Board's current members from calling into question the Director Defendants' conduct. Specifically, none of the Board's current members have taken remedial action to redress the conduct alleged herein. For instance, none of the Board's current members have sought to enforce the Company's Clawback Policy, which requires the Board to "recover from covered executive officers any incentive-based compensation received by them while they were an executive officer" in the event Block is "required to prepare an accounting restatement due to [] material noncompliance with financial reporting requirements under applicable securities laws."

138.    The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

139.    The acts complained of herein constitute violations of fiduciary duties owed by Block's officers and directors, and these acts are incapable of ratification.

140.    The Individual Defendants may also be protected against personal liability for their

acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds i.e., monies belonging to the stockholders of Block. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of Block, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

141.    If there is no directors' and officers' liability insurance, then the directors will not cause Block to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

142.    Thus, for all of the reasons set forth above, all of Block's current directors are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## COUNT I
### Against the Individual Defendants for Violations of § 10(b)
### of the Exchange Act, 15 U.S.C. § 78(j), and Rule 10b-5, 17 C.F.R. § 240.10b-5

143.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

144.    The Individual Defendants participated in a scheme with the purpose and effect of

defrauding Block. Not only is Block now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Block by the Individual Defendants.

145.    During the Relevant Period, the Individual Defendants caused the Company to overpay by approximately $17 million to repurchase roughly 7 million shares.

146.    The Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

147.    The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Block not misleading.

148.    The Individual Defendants, as directors and officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Block.

149.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The

Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

150.    By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### Against the Individual Defendants for Violations of § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9)

151.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

152.    The Individual Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

153.    The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2022 Proxy filed with the SEC. As alleged above, this filing contained materially false and misleading statements concerning the Company's risk management function and its internal controls over financial reporting.

154.    The 2022 Proxy was used to solicit shareholder votes in connection with the election of Defendants Dorsey and Deighton to serve for another three-year term on the Company's Board. In addition, the 2022 Proxy was used to solicit the advisory vote to approve the compensation of, *inter alia*, Defendants Dorsey and Ahuja. While the shareholder vote was non-binding, the 2022 Proxy indicated that the Board considers the results of the vote, stating:

> The Say-on-Pay vote will, however, provide information to us regarding investor sentiment about our executive compensation philosophy, policies and practices, which our compensation committee will consider when determining executive

compensation for the remainder of the current fiscal year and beyond. Our board of directors and our compensation committee value the opinions of our stockholders. To the extent there is any significant vote against the compensation of our named executive officers as disclosed in this proxy statement, we will endeavor to communicate with stockholders to better understand the concerns that influenced the vote and consider our stockholders' concerns, and our compensation committee will evaluate whether any actions are necessary to address those concerns.

155.    Describing the Company's "Executive Compensation Philosophy," the 2022 Proxy indicates that compensation is "performance-driven," stating that, "by creating compensation programs that reward individual performance and achievement of corporate objectives, our employees are incentivized to perform their best work and receive financial awards for their impact on Block and our business."

156.    The materially false and misleading statements contained in the 2022 Proxy regarding the Company's risk management function and its internal controls over financial reporting therefore misleadingly induced shareholders to vote in favor of the election of Defendants Dorsey and Deighton, and performance-based compensation to Defendants Dorsey and Ahuja, to which they were not entitled.

157.    The payment of unwarranted performance-based compensation to these Company executives was a waste of corporate assets.

## COUNT III

**Against the Individual Defendants
For Breach of Fiduciary Duty**

158.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

159.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

160.    The Individual Defendants violated and breached their fiduciary duties of care,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

loyalty, reasonable inquiry, and good faith.

161.   The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by failing to implement and monitor adequate internal controls over the Company's financial reporting and, as a consequence, issuing or permitting the issuance of materially false and misleading statements in the Company's SEC filings and other public disclosures. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

162.   As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

163.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT IV

### Against the Individual Defendants for Aiding and
### Abetting Breach of Fiduciary Duty

164.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

165.   By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their

fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

166.    Plaintiff, on behalf of Block, has no adequate remedy at law.

**COUNT V**
**Against the Individual Defendants**
**For Unjust Enrichment**

167.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

168.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Block.

169.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Block that were tied to the performance or artificially inflated valuation of Block, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

170.    Plaintiff, as a shareholder and a representative of Block, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

171.    Plaintiff, on behalf of Block, has no adequate remedy at law.

**COUNT VI**
**Against the Individual Defendants**
**For Abuse of Control**

172.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

173.    The Individual Defendants misconduct alleged herein constituted an abuse of their control over the Company, for which they are legally liable.

174.    As a direct and proximate cause of the Individual Defendants' abuse of control, the Company has sustained substantial damages.

175.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

**COUNT VII**
**Against the Individual Defendants**
**For Waste of Corporate Assets**

176.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

177.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.   It resulted in continuous, connected, and ongoing harm to the Company.

178.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and collecting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Class Action.

179.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

180.    Plaintiff, on behalf Block, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.      Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.      Awarding punitive damages;

D.      Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: February 5, 2025          Respectfully submitted,

**TOSTRUD LAW GROUP, P.C.**
Jon A. Tostrud (CA. Bar No. 199502)

*/s/ Jon A. Tostrud*
   Jon A. Tostrud

1925 Century Park East, Ste. 2100
Los Angeles, CA. 90067
Telephone: (310) 278-2600
Facsimile: (310) 278-2640
jtostrud@tostrudlaw.com

**RIGRODSKY LAW, P.A.**
Timothy J. MacFall
Samir Aougab
825 East Gate Boulevard, Ste. 300
Garden City, NY 11530
Telephone: (516) 683-3516
tjm@rl-legal.com

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

sa@rl-legal.com

**GRABAR LAW OFFICE**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Ste. 3600
Philadelphia, PA 19103
Telephone: 267-507-6085
jgrabar@grabarlaw.com

*Attorneys for Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## <u>VERIFICATION OF VIRAJ PATEL</u>

I, Viraj Patel, am a plaintiff in this action. I have reviewed the allegations made in the Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. As to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _2/3/2025_

Signed by:

_Viraj Patel_
F18B7870D432468
Viraj Patel