GIBSON, DUNN & CRUTCHER LLP
BRIAN M. LUTZ, SBN 255976
    blutz@gibsondunn.com
One Embarcadero Center
Suite 2600
San Francisco, California 94111-3715
Telephone: 415.393.8200

JESSICA VALENZUELA, SBN 220934
    jvalenzuela@gibsondunn.com
310 University Avenue
Palo Alto, CA 94301
Telephone: 650.849.5300

COLIN B. DAVIS, SBN 273942
    cdavis@gibsondunn.com
3161 Michelson Drive, Suite 1200
Irvine, CA 92612
Telephone: 949.451.3800

*Attorneys for Defendants Dorsey, Ahuja, Botha,
Brooks, Carter, Deighton, Garutti, McKelvey,
Meeker, Patterson, Rothstein, Summers, and Viniar
and Nominal Defendant, Block, Inc.*

## IN THE UNITED STATES DISTRICT COURT

### FOR THE NORTHERN DISTRICT OF CALIFORNIA

#### SAN JOSE DIVISION

| | |
|---|---|
| IN RE BLOCK INC. SHAREHOLDER DERIVATIVE LITIGATION<br><br>This Document Relates to:<br><br>ALL ACTIONS | Case No. 5:25-cv-01262-NW<br><br>**BLOCK, INC.'S AND THE INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT PURSUANT TO FED. R. CIV. P. 23.1 AND 12(B)(6); MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**Hearing:**<br>Date:      November 12, 2025<br>Time:      9:00 a.m.<br>Place:     Courtroom 3, 5th Floor |

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES .......................................................... 1

STATEMENT OF ISSUES TO BE DECIDED .................................................................. 1

I.     PRELIMINARY STATEMENT ...................................................................... 1

II.    FACTUAL BACKGROUND .......................................................................... 3

III.   LEGAL STANDARD FOR PLEADING DEMAND FUTILITY ............................... 6

IV.    ARGUMENT .............................................................................................. 7

    A.   Plaintiffs Fail to Demonstrate That a Majority of the Demand Board Faces a Substantial Likelihood of Personal Liability for Breach of Fiduciary Duty .......................................................................................... 8

        1.   Plaintiffs Do Not Adequately Allege that the Board Breached its Oversight Duty ............................................................................ 8

        2.   Plaintiffs' Ancillary *Caremark* Theories as to Certain Defendants Also Fail ................................................................... 16

    B.   Plaintiffs Do Not Adequately Allege that Mr. Dorsey and Mr. McKelvey Face a Substantial Likelihood of Liability for, or Materially Benefited from, Insider Trading ................................................ 17

    C.   Plaintiffs Fail to Allege Facts Showing that the Demand Board Lacks Independence .................................................................................... 18

        1.   Mr. Dorsey and Mr. McKelvey ....................................................... 19

        2.   Ms. Meeker ................................................................................. 20

        3.   Mr. Botha .................................................................................... 20

        4.   Mr. Eisen ..................................................................................... 21

    D.   Even If Demand Were Excused, the Complaint Must Be Dismissed Under Rule 12(b)(6) for Failure to State a Claim. ....................................... 21

        1.   Plaintiffs Fail to State a Claim for Breach of Fiduciary Duty or Insider Trading. ........................................................................... 21

        2.   Plaintiffs Fail to State any Claims Under the Exchange Act. ............. 22

V.     CONCLUSION .......................................................................................... 25

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Apple Computer, Inc. v. Exponential Tech.,*
Inc., 1999 WL 39547, at *12 (Del. Ch. Jan. 21, 1999) ...................................................19

*Arnold v.Soc'y for Sav. Bancorp, Inc.,*
650 A.2d 1270 (Del. 1994) .............................................................................................16

*Aronson v. Lewis,*
473 A.2d 805 (Del. 1984) ..................................................................................................6

*Beam v. Stewart,*
845 A.2d 1040 (Del. 2004) ....................................................................................6, 19, 20

*Brehm v. The Walt Disney Company,*
746 A.2d 244, 254 (Del. 2000).  .......................................................................................7

*In re Camping World Hold., Inc. Stockholder Deriv. Litig.,*
2022 WL 288152 (Del. Ch. Jan. 31, 2022) ....................................................................17

*Reiter ex rel. Capital One Fin. Corp. v. Fairbank,*
2016 WL 6081823 (Del. Ch. Oct. 18, 2016)...................................................................12

*Cent. Laborers' Pension Fund v. Karp,*
2025 WL 1213104 (Del. Ch. Apr. 25, 2025) ..................................................................17

*City of Birmingham Ret. & Relief Sys. v. Good,*
177 A.3d 47 (Del. 2017) ..............................................................................................1, 8

*Clem v. Skinner,*
2024 WL 668523 (Del. Ch. Feb. 19, 2024) .....................................................................9

*In re Clovis Oncology, Inc. Derivative Litig.,*
2019 WL 4850188 (Del. Ch. Oct. 1, 2019)................................................................17, 18

*In re Cognizant Tech. Sols. Corp. Derivative Litig.,*
2022 WL 4483595 (D.N.J. Sept. 27, 2022), *aff'd*, 101 F.4th 250 (3d Cir. 2024)...........11

*Crescent/Mach I Prs, L.P. v. Turner,*
846 A.2d 963 (Del. Ch. 2000)..........................................................................................19

*Desimone v. Barrows,*
924 A.2d 908 (Del. Ch. 2007).........................................................................1, 9, 13, 14

*In re Diamond Foods, Inc. Deriv. Litig.,*
2012 WL 1945814 (N.D. Cal. May 29, 2012) .................................................................24

*Drulias v. Guthrie,*
2019 WL 13240415 (C.D. Cal. Oct. 23, 2019) ...............................................................25

*Elfers v. Gonzalez,*
2020 WL 7264272 (D. Del. Dec. 10, 2020)...............................................................22, 23

BLOCK, INC.'S AND THE INDIVIDUAL DEFS.' MOT. TO DISMISS PURSUANT TO FRCP 23.1 AND 12(B)(6)
CASE NO. 5:25-CV-01262-NW

Gibson, Dunn &
Crutcher LLP

*Ellusionist Cash Balance Plan & Tr. v. Spiegel Acct. Corp.*,
  2024 WL 4294645 (N.D. Cal. Sept. 24, 2024) ...............................................................25

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.*,
  922 F. Supp. 2d 445 (S.D.N.Y. 2013), *aff'd sub nom. In re Facebook, Inc., Initial
  Pub. Offering Deriv. Litig.*, 797 F.3d 148 (2d Cir. 2015) ............................................21

*Pettry ex rel. FedEx Corp. v. Smith*,
  2021 WL 2644475 (Del. Ch. June 28, 2021) ...................................................................9

*Firemen's Ret. Sys. of St. Louis on behalf of Marriott Int'l, Inc. v. Sorenson*,
  2021 WL 4593777, at *13 (Del. Ch. Oct. 5, 2021) ..........................................................9

*Franklin v. Doheny*,
  2022 WL 2064972 (D. Del. June 8, 2022) .....................................................................23

*Gen. Elec. Co. by Levit v. Cathcart*,
  980 F.2d 927 (3rd Cir. 1992) .........................................................................................24

*Genworth Fin., Inc. Consol. Derivative Litig.*, 2021 WL 4452338, at *12 (Del. Ch.
  Sept. 29, 2021) .................................................................................................................3

*In re Goldman Sachs Grp., Inc. S'holder Litig.*,
  2011 WL 4826104 (Del. Ch. Oct. 12, 2011) ............................................................11, 21

*Gonsalves v. Block*,
  No. 25-cv-00642 (N.D. Cal) ..........................................................................................22

*In re GoPro, Inc.*,
  2020 WL 2036602 (Del. Ch. Apr. 28, 2020) ...................................................................9

*Horman v. Abney*,
  2017 WL 242571 (Del. Ch. Jan. 19, 2017) ......................................................................9

*In re HP Deriv. Litig.*,
  2012 WL 4468423 (N.D. Cal. Sept. 25, 2012) ..............................................................24

*In re Impax Labs., Inc. S'holder Deriv. Litig.*,
  2015 WL 5168777 (N.D. Cal. Sept. 3, 2015) ...................................................................6

*Kahn v. Kolberg Kravis Roberts & Co., L.P.*,
  23 A.3d 831 (Del. 2011) .................................................................................................17

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ...........................................................................................3

*Lee v. Fisher*,
  70 F.4th 1129 (9th Cir. 2023) .........................................................................................22

*Mulquin v. Nektar Therapeutics*,
  510 F. Supp. 3d 854 (N.D. Cal. 2020) ...........................................................................10

*Ocegueda on behalf of Facebook v. Zuckerberg*,
  526 F. Supp. 3d 637, 648 (N.D. Cal. 2021). ............................................................19, 25

*Oklahoma Firefighters Pension & Ret. Sys. v. Corbat*,
　　2017 WL 6452240 (Del. Ch. Dec. 18, 2017) .........................................................10

*Olenik v. Lodzinski*,
　　2018 WL 3493092 (Del. Ch. July 20, 2018), *aff'd in part, rev'd in part on other
　　grounds*, 208 A.3d 704 (Del. 2019) ....................................................................20

*Orman v. Cullman*,
　　794 A.2d 5 (Del. Ch. 2002)...................................................................................19

*In re Paypal Hldgs., Inc. S'holder Deriv. Litig.*,
　　2018 WL 466527 (N.D. Cal. Jan. 18, 2018) .....................................................8, 24

*Pirelli Armstrong Tire Corp. Ret. Med. Benefits Trust v. Raines*,
　　534 F.3d 779 (D.C. Cir. 2008)................................................................................6

*Zimmerman ex rel. Priceline.com, Inc. v. Braddock*,
　　2002 WL 31926608 (Del. Ch. Dec. 20, 2002) ......................................................19

*Rales v. Blasband*,
　　634 A.2d 927 (Del. 1993) .......................................................................................7

*Rattner v. Bidzos*,
　　2003 WL 22284323 (Del. Ch. Oct. 7, 2003) .........................................................16

*Retail Wholesale & Department Store Union Local 338 Ret. Fund v. Hewlett-Packard
　　Co.*,
　　845 F.3d 1268 (9th Cir. 2017)...............................................................................23

*Richardson as Tr. of Richardson Living Tr. v. Clark*,
　　No. CV 2019-1015-SG, 2020 WL 7861335 (Del. Ch. Dec. 31, 2020)..........................11

*In re Rigel Pharms., Inc. Sec. Litig.*,
　　697 F.3d 869 (9th Cir. 2012)..................................................................................23

*Seminaris v. Landa*,
　　662 A.2d 1350 (Del. Ch. 1995)................................................................................7

*In re Silicon Graphics, Inc. Sec. Litig.*,
　　183 F.3d 970 (9th Cir. 1999)..................................................................................23

*South v. Baker*,
　　62 A.3d 1 (Del. Ch. 2012).................................................................................7, 13

*Stone v. Ritter*,
　　911 A.2d 362 (Del. 2006) ............................................................................8, 13, 14

*Tindall v. First Solar Inc.*,
　　892 F.3d 1043 (9th Cir. 2018).................................................................................6

*In re Trade Desk, Inc. Derivative Litig.*,
　　2025 WL 503015 (Del. Ch. Feb. 14, 2025) ..........................................................20

*In re TrueCar, Inc. S'holder Derivative Litig.*,
　　2020 WL 5816761 .................................................................................................18

Gibson, Dunn &
Crutcher LLP

*United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State*
  *Pension Fund v. Zuckerberg,*
  262 A.3d 1034 (Del. 2021) ...........................................................................6, 7, 8, 18

*VantagePoint Venture Partners 1996 v. Examen, Inc.,*
  871 A.2d 1108 (Del. 2005) ...........................................................................21

*In re Vaxart, Inc. S'holder Litig.,*
  2021 WL 5858696 (Del. Ch. Nov. 30, 2021).................................................17

*In re Verisign, Inc. Deriv. Litig.,*
  531 F. Supp. 2d 1173 (N.D. Cal. 2007) ......................................................23, 24

*Weiss v. Swanson,*
  948 A.2d 433 (Del. Ch. 2008)........................................................................6

*Wood v. Baum,*
  953 A.2d 136, 141 (Del. 2008........................................................................8

*In re Yahoo! Inc. S'holder Derivative Litig.,*
  153 F. Supp. 3d 1107 (N.D. Cal. 2015) ......................................................6, 17

*Zucco Partners, LLC v. Digimarc Corp.,*
  552 F.3d 981 (9th Cir. 2009), *as amended* (Feb. 10, 2009).............................22

**Statutes**

Delaware General Corporation Law § 102(b)(7) ...................................................8

Exchange Act § 10(b).........................................................................5, 7, 25

Exchange Act § 14(a).........................................................................5, 7, 25

Exchange Act § 29(b.........................................................................5, 7, 25

**Rules**

Federal Rules of Civil Procedure Rule 9(b)..........................................................24

Federal Rules of Civil Procedure Rule 10b5-1 ........................................................2

Federal Rules of Civil Procedure 12(b)(6).....................................................1, 1, 6, 21

Federal Rules of Civil Procedure 23.1 ........................................................1, 1, 6, 21

Rule 10b5-1...................................................................................17

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that at 9:00 a.m. on November 12, 2025, or as soon thereafter as the matter may be heard, in the United States District Court for the Northern District of California, San Jose Courthouse, Courtroom 3, 5th Floor, located at 280 South First Street, San Jose, California, Nominal Defendant Block, Inc. ("Block" or the "Company") and the named individual defendants ("Individual Defendants"), through their undersigned counsel, will, and hereby do, move to dismiss the Consolidated Shareholder Derivative Complaint (the "Complaint") pursuant to Federal Rules of Civil Procedure 23.1 and 12(b)(6) (the "Motion").

Block and the Individual Defendants seek dismissal of the Complaint with prejudice pursuant to Rule 23.1 because Plaintiffs failed to make a pre-suit demand on Block's Board of Directors or to plead adequately demand futility. The Individual Defendants also seek dismissal pursuant to Rule 12(b)(6) because Plaintiffs fail to state a claim upon which relief can be granted. This Motion is based on this Notice, the supporting Memorandum of Points and Authorities (the "Memorandum"), the Declaration of Brian M. Lutz filed concurrently herewith, the accompanying Request for Judicial Notice and Incorporation by Reference, the complete files and records in this action, and any additional material and arguments as may be considered in connection with the hearing.

## MEMORANDUM OF POINTS AND AUTHORITIES

Block and the Individual Defendants submit this Memorandum in support of their Motion.

### STATEMENT OF ISSUES TO BE DECIDED

Whether the Court should dismiss the Complaint with prejudice for (i) failure to make a pre-suit demand and to plead with particularity that such a demand would have been futile, as required by Rule 23.1 and Delaware law, or (ii) failure to state a claim under Rule 12(b)(6).

### I.    PRELIMINARY STATEMENT

Before a shareholder of a Delaware corporation can proceed with a derivative lawsuit on behalf of the corporation, the shareholder must make a demand on the corporation's board of directors to investigate and pursue the claims the plaintiff seeks to assert. Plaintiffs did not make a pre-suit demand on Block's Board, claiming they are excused from doing so. To show that they are excused from making such a demand, Plaintiffs face an uphill climb; they must overcome the presumption that

1

Gibson, Dunn &
Crutcher LLP

Block's directors are capable of objectively considering a demand by pleading *particularized* facts demonstrating the Board's inability to do so—presumptions and conclusory statements fall far short.

Plaintiffs claim it would have been futile for them to make a pre-suit demand because a majority of the members of Block's Board face a substantial likelihood of liability for allegedly failing to adequately oversee Block's compliance program. This type of claim—called a *Caremark* claim—is "possibly the most difficult theory in corporation law" on which a shareholder plaintiff can seek to prove liability. *City of Birmingham Ret. & Relief Sys. v. Good*, 177 A.3d 47, 55 (Del. 2017). To meet this high burden, Plaintiffs must plead specific facts showing that at least half of Block's current directors consciously failed to even try to address known violations of the law. *In re McDonald's Corp. S'holder Derivative Litig.*, 291 A.3d 652, 677 (Del. Ch. 2023). The Complaint comes nowhere close to meeting this standard. As the very documents on which Plaintiffs rely (and badly mischaracterize) throughout the Complaint show, Block's Board oversaw an evolving compliance program that responded to the changing compliance demands of Block's high-growth Cash App business. The documents incorporated by reference in the Complaint also show that—far from turning a blind eye to compliance problems or legal violations—Block's Board received detailed compliance reports and oversaw a compliance program that invested *more* resources and hired *more* employees and experts over the course of the relevant period. The record here shows good corporate governance, not an intent by Block's directors to consciously ignore known compliance failures.

Plaintiffs' alternative argument—that certain directors lack independence from Mr. Dorsey and Mr. McKelvey, who allegedly face a substantial likelihood of liability for purported insider trading—also falls well short of pleading demand futility. Every stock sale in question occurred pursuant to a Rule 10b5-1 plan (which removed any trading discretion), the trades were consistent with prior trading, and Mr. Dorsey and Mr. McKelvey retained substantial stakes in Block even after the sales. There is no serious argument that either director faces *any* liability for insider trading, let alone a substantial likelihood of liability. But even if the Court found that demand was excused as to Mr. Dorsey or Mr. McKelvey, Plaintiffs fail to plead specific facts demonstrating that the other directors are disqualified from considering a demand because they are beholden to either Mr. Dorsey or

Gibson, Dunn & Crutcher LLP

Mr. McKelvey.  At most, Plaintiffs point to ordinary course business and social relationships that do not as a matter of law render a director incapable of acting in a corporation's best interests.

When weighed against the accepted legal standard, the Complaint must be dismissed.  It offers little more than conclusory allegations, baseless invective, and misleading characterization of Board documents, which is not enough—not nearly enough—to show that demand was excused under Rule 23.1 and Delaware law.  Plaintiffs have not carried and cannot carry their heavy burden of bypassing the threshold demand requirement.  Moreover, even if Plaintiffs could somehow show that demand was futile, the Complaint still merits dismissal because it fails to state a claim.[1]

## II.    FACTUAL BACKGROUND

***Block's Business.***  Block (formerly Square, Inc.) was founded in 2009 by Jack Dorsey, who serves as Block's CEO and Chairman of the Board, and James McKelvey, a member of the Board since Block's founding.  ¶ 42.[2]  Block provides financial products and services to help sellers start, run, and grow businesses, and help individuals send, receive, and manage their money.  *See* ¶ 42–43.  During the relevant period, Block's business consisted of multiple products, including Cash App, a mobile payment service that allows consumers to send, receive, and invest money, among other financial services.  ¶ 43.  Block's purpose is to build and leverage technology to expand economic access.  *See* ¶ 2.  For example, Block assisted governmental efforts to distribute stimulus and unemployment insurance payments during the COVID pandemic.  ¶¶ 49–51.  Since its launch in 2013, Cash App has grown significantly.  ¶ 91.

***Block's Compliance Program.***  Block operates in highly regulated industries.  ¶¶ 52–55.  The Company established a program to "comply with applicable laws, regulations, and guidelines to monitor, detect, prevent and report possible money laundering, financial crimes and terrorist financing," including the Bank Secrecy Act (BSA).  ¶ 63.  Block's Board has █████████

---

[1] Plaintiffs' claims also are subject to dismissal on *forum non conveniens* grounds as set forth in Defendants' concurrently filed motion to dismiss.  If the Court dismisses the case on *forum non conveniens* grounds, as it should, it need not consider the arguments raised in the instant motion.

[2] Citations in the form of "¶ _" or "¶¶ _" refer to the paragraphs of the Consolidated Shareholder Derivative Complaint (Dkt. No. 1).

Gibson, Dunn &
Crutcher LLP

1        █████████████████████████████████████████. Ex. B at 28.[3] The Board

2 also maintains an Audit and Risk Committee (ARC) "to assist with overseeing the Company's

3 compliance with applicable law (including federal securities laws and other legal and regulatory

4 requirements)." ¶ 63. Block is subject to laws and regulations that require it to maintain procedures

5 for customer due diligence and reporting suspicious activity. ¶¶ 52-55. Block ████████████

6 ████████████████████████████████████████████████████████████

7 Ex. Z at 7; *see also* Ex. E at 5. ███████████████████████████████████

8 ████████████████████████████ Ex. R at 5; *see also* Ex. U at 5. The

9 Board and ARC oversee and receive regular updates regarding the Company's compliance program as

10 reflected in the documents incorporated by reference in the Complaint. *See* ¶ 70.

11        Block's Board has overseen the Company's investment in building and maintaining a

12 compliance program to respond to the evolving demands of its business. By 2019, when Cash App

13 began to experience significant growth, Block had ██████████████████████

14 ████████████████████████████████████████████████████████████

15 ███████████████████████████ Ex. N at 5, 5 n.2. In 2020, as Cash App's business

16 expanded, the Company's compliance team ███████████████████████████

17 ████████████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████████████

19 █████████████ Ex. P at 9. It dedicated significant resources to ████████████

20 ████████████████████████████████████████████████████████████

21

22 [3] The Court may refer to documents incorporated in the Complaint by reference. *See* RJN at 1–4; *see also Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) (where complaint "refers

23 extensively to [a] document or [a] document forms the basis of the plaintiff's claim," a court may treat the documents "as though they are part of the complaint itself" to "preven[t] plaintiffs from selecting

24 only portions of documents that support their claims, while omitting portions" "that weaken—or doom—their claims"); *Genworth Fin., Inc. Consol. Derivative Litig.*, 2021 WL 4452338, at *12 (Del.

25 Ch. Sept. 29, 2021) (considering Section 220 documents "to determine whether the Complaint has accurately referenced their contents in support of Plaintiffs' claims and in pleading demand futility").

26 Notably, the corporate books and records Defendants request to incorporate by reference here were produced by Block to Plaintiff Kelly under a confidentiality agreement pursuant to which the parties

27 expressly agreed that the documents would be incorporated by reference into any complaint Plaintiff Kelly filed. RJN at 3. Citations to pages from Defendants' exhibits refer to ECF page numbers.

28

Gibson, Dunn &
Crutcher LLP

1     ████████ Ex. Q at 14–21. ████████████████████████████████

2     ████████████████████████████████████████████████████████████

3     ██████████████████████████ Ex. Q at 10.

4     ███████████████████████████████████████████████ and

5     committed to ██████████████████████████████████

6     ████████████████ in 2021, Block formed a team dedicated to ████████████

7     ██████████████████████████████████████████ Ex. T at 14. ██

8     ████████████████████████████████████████████████████████████

9     ████████████████████ Ex. S at 9. In 2022, as Cash App continued growing,

10     Block invested in technology to ██████████████████████████

11     Ex. K at 7. ████████████████████████████████████████

12     ███████████████ Ex. Y at 13.

13         Block's Board at various times was informed that the Company's compliance efforts ██████

14     ████████████████████████████████████████████████████████████

15     ████████████████████████████████████████████████████████████

16     Ex. F at 4. ██████████████████████████████████████████████

17     Ex. N at 6. ██████████████████████████████████████████████

18     ████████████████ Ex. R at 7. ████████████████████████

19     ████████████████████████████████████████████████████████████

20     Ex. J at 5, *see also* Ex. T at 8. ██████████████████████████

21     ████████████████████████████████████████████████████████████

22     ██████████████████ Ex. V at 8–9. ████████████████████████

23     ████████████████████████ Ex. X at 11.

24         ***The Hindenburg Report and Government Investigations.*** On March 23, 2023, Hindenburg

25     Research, a short seller (an investor that benefits when the stock price declines) issued a report raising

26     alleged concerns with Block's compliance program. ¶ 190. The Company separately received

27     inquiries from the SEC and DOJ, ¶ 230, and entered into settlements with the State Money



Transmission Regulators, Consumer Financial Protection Bureau, and New York Department of Financial Services, in which Block did not admit that it violated any law.  ¶¶ 225, 220, 228.

*This Action.*  Plaintiffs purport to assert derivative claims on Block's behalf against eight current directors, five former directors, and two officers, one of whom also is a current director.  ¶¶ 22-38.  Plaintiffs bring claims for alleged breaches of fiduciary duty under Delaware law and violations of Section 14(a), 10(b), and 29(b) of the Exchange Act.  ¶¶ 325-376.  Plaintiffs admit that they did not make a pre-suit demand on Block's Board, which consists of ten members (the "Demand Board").  ¶¶ 267-68.[4]  Plaintiffs contend that making a demand would have been futile because the Demand Board could not "properly exercise its independent and disinterested business judgment in responding to a demand."  ¶ 269.  Specifically, Plaintiffs claim that a majority of the Demand Board members are incapable of objectively considering a demand because they face a "substantial likelihood of liability" "and/or [are] controlled by and/or beholden to" Mr. Dorsey and Mr. McKelvey, who "materially benefited from" the alleged acts and omissions and who "face substantial liability as a result."  ¶ 269.

## III.   LEGAL STANDARD FOR PLEADING DEMAND FUTILITY

Block is incorporated in Delaware.  Because "[t]he law of the state of incorporation governs whether demand is futile," "Delaware law . . . applies to this action."  *Tindall v. First Solar Inc.*, 892 F.3d 1043, 1046 (9th Cir. 2018).  "A cardinal precept" of Delaware law is "that directors, rather than shareholders, manage the business and affairs of the corporation."  *United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1047 (Del. 2021) (citation omitted).  "The board's authority to govern corporate affairs extends to decisions about . . . whether the corporation should file a lawsuit against its directors, its officers, . . . or an outsider."  *Id.*  Rule 23.1 therefore requires a shareholder plaintiff to either "demand action from the corporation's directors" before bringing a derivative suit or "plead with particularity the reasons why such demand would have been futile."  *Tindall*, 892 F.3d at 1046 (9th Cir. 2018) (quotation omitted).

Where, as here, shareholders allege that demand is futile, Delaware law is "clear that the bar is high, the standards are stringent, and the situations where demand will be excused are rare."  *Pirelli*

---

[4] The members of the Demand Board are: Jack Dorsey, James McKelvey, Roelof Botha, Amy Brooks, Shawn Carter, Paul Deighton, Anthony Eisen, Randy Garutti, Mary Meeker, and Neha Narula.

Gibson, Dunn & Crutcher LLP

*Armstrong Tire Corp. Ret. Med. Benefits Tr. v. Raines*, 534 F.3d 779, 782-83 (D.C. Cir. 2008). The heightened burden of pleading demand futility with particularity is "'more onerous' than that required to withstand a Rule 12(b)(6)" motion to dismiss. *In re Yahoo! Inc. S'holder Derivative Litig.*, 153 F. Supp. 3d 1107, 1119 (N.D. Cal. 2015) (quoting *Weiss v. Swanson*, 948 A.2d 433, 441 (Del. Ch. 2008)). "[B]ecause derivative litigation upsets the balance of power that the [Delaware General Corporation Law] establishes between a corporation's directors and its stockholders," "the demand requirement is not excused lightly." *Zuckerberg*, 262 A.3d at 1048-49. "In the context of demand futility, 'directors are entitled to a presumption that they were faithful to their fiduciary duties,' and 'the burden is upon the plaintiff . . . to overcome that presumption.'" *In re Impax Labs., Inc. S'holder Deriv. Litig.*, 2015 WL 5168777, at *4 (N.D. Cal. Sept. 3, 2015) (emphasis removed) (quoting *Beam v. Stewart*, 845 A.2d 1040, 1048-49 (Del. 2004)). To meet the threshold requirement of pleading that they were excused from making a pre-suit demand, Plaintiffs must plead "particularized factual statements" that create a reasonable doubt that half of the Demand Board "could have properly exercised its independent and disinterested business judgment in responding to a demand." *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000); *City of Birmingham Ret. & Relief Sys.*, 177 A.3d at 56.

Delaware has adopted a three-part test to assess demand futility, asking, for each director: "(i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand; (ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand." *Zuckerberg*, 262 A.3d at 1058. Plaintiffs must show "the answer to any [one] of the questions is 'yes' for at least half of the members of the demand board"—so, at least five of ten—for demand to be excused. *Id.* at 1059.

## IV.    ARGUMENT

Plaintiffs' principal demand futility theory is that a majority of the Demand Board faces a substantial likelihood of liability for breaching their fiduciary duties. ¶¶ 270-276. Plaintiffs allege that Mr. Dorsey and Mr. McKelvey also face a substantial likelihood of liability for insider trading. ¶¶ 277-

7

280.[5]  Alternatively and conjunctively, Plaintiffs allege that members of the Demand Board lack independence from Mr. Dorsey and/or Mr. McKelvey.  ¶¶ 281-322.  Each theory fails.

**A.    Plaintiffs Fail to Demonstrate That a Majority of the Demand Board Faces a Substantial Likelihood of Personal Liability for Breach of Fiduciary Duty**

Plaintiffs asserting a theory that board members face a substantial likelihood of liability must overcome a heavy burden; such liability exists only in the "rare case" of "egregious" conduct, *Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del. Ch. 1995), and must be more than "a mere threat" of liability, *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993).  Nor can Plaintiffs "simply. . . describ[e] [a] calamity and alleg[e] that it occurred on the directors' watch."  *South v. Baker*, 62 A.3d 1, 14 (Del. Ch. 2012).  The complaint must allege with particularized facts—on a director-by-director and claim-by-claim basis—why each director faces a substantial likelihood of being held personally liable to the corporation for the alleged legal violation.  *Zuckerberg*, 262 A.3d at 1059.

Plaintiffs' exacting burden for pleading a substantial likelihood of liability for breach of fiduciary duty is further heightened by the exculpation provision in Block's Certificate of Incorporation.  That provision, as permitted under Section 102(b)(7) of the Delaware General Corporation Law, exculpates the Company's directors from liability for breaches of fiduciary duty "to the fullest extent authorized by [law]."  Lutz Decl. Ex. II at 13.  "Accordingly, 'a serious threat of liability may only be found to exist if the plaintiff pleads a non-exculpated claim,' which requires plaintiffs to allege particularized facts showing that the directors engaged in 'disloyal,' 'fraudulent, illegal or bad faith conduct,' and 'acted with scienter.'"  *In re Paypal Holdings, Inc. S'holder Derivative Litig.*, 2018 WL 466527, at *3 (N.D. Cal. Jan. 18, 2018) (quoting *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008)).  "Negligent or even reckless conduct is insufficient."  *Id.*

**1.    Plaintiffs Do Not Adequately Allege that the Board Breached its Oversight Duty**

Plaintiffs allege that demand would be futile because a majority of the Board faces a substantial likelihood of liability for "fail[ing] to supervise management and implement adequate measures to correct [] identified compliance deficiencies."  ¶ 271.  This claim, known as a *Caremark* claim, is

---

[5]  Plaintiffs *do not* contend that demand is futile based on a substantial likelihood of liability for Counts 1-3 for alleged violations of Section 14(a), 10(b), and 29(b) of the Exchange Act.  ¶¶ 267-280.

Gibson, Dunn &
Crutcher LLP

"possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *City of Birmingham Ret. & Relief Sys.*, 177 A.3d at 55.  To plead a *Caremark* claim, Plaintiffs must allege with particularity that either "(a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006) (emphasis removed).  At bottom, a non-exculpated *Caremark* claim requires a plaintiff to plead particularized facts demonstrating each targeted director acted in "bad faith" and "knew that they were not discharging their fiduciary obligations." *Id.*

Plaintiffs do not attempt to plead demand futility under the first *Caremark* prong, *i.e.*, that the Board failed to establish a system of controls.  Indeed, Plaintiffs concede the existence of such a system by alleging that Block had an Audit and Risk Committee, Block had implemented relevant corporate policies and procedures, and the Board frequently received reports regarding Block's compliance program. ¶¶ 63-70, 84; *see Firemen's Ret. Sys. of St. Louis on behalf of Marriott Int'l, Inc. v. Sorenson*, 2021 WL 4593777, at *13 (Del. Ch. Oct. 5, 2021) (plaintiffs failed to plead demand futility for *Caremark* claim where company had system for assessing risk where board and audit committee were "routinely apprised" of risks, provided annual risk assessments, and engaged auditors).

Instead, Plaintiffs hang their demand futility claim on the second *Caremark* prong, claiming that Block's Board failed its oversight duties because it "was presented with a plethora of red flags" "yet failed to correct the identified deficiencies."  ¶ 84.  Critically, Plaintiffs do not contend—as they must—that the Board did *nothing* in response to these alleged "red flags."  *In re GoPro, Inc.*, 2020 WL 2036602, at *13 (Del. Ch. Apr. 28, 2020) ("A *Caremark* claim cannot be squared with an allegation the Board responded to red flags."); *Horman v. Abney*, 2017 WL 242571, at *14 (Del. Ch. Jan. 19, 2017) (*Caremark* claim dismissed where documents showed that when "red flags were waved," the "Board responded").  Rather, Plaintiffs take issue with *how* the Board responded to these "red flags," faulting Block's "rel[iance] on 'machine learning'" and █████████████████████ "rather than appropriately fund[ing] the Company's compliance program."  ¶ 84; *see also* ¶ 97 ████████████████████████████████████████);

1    ¶ 123 (████████████████████████████████████████████████

2    ████████████████████████████████████); ¶ 154 ████████████████████████

3    █████████████). Delaware law is clear that allegations like these that fault the *manner* in which the

4    Board responded to alleged "red flags" fail as a matter of law; to prevail on a *Caremark* claim, Plaintiffs

5    must show a *total failure* to respond altogether. *See Pettry ex rel. FedEx Corp. v. Smith*, 2021 WL

6    2644475, at *9 (Del. Ch. June 28, 2021) ("focus" "on the manner and timing of the Board's response"

7    "misses the mark for a *Caremark* claim"); *Clem v. Skinner*, 2024 WL 668523, at *8 (Del. Ch. Feb. 19,

8    2024) (plaintiff's "quibble[s] with the timing or success of [a] corrective action necessarily fail," as a

9    "court's role is not to second-guess a board's response to a red flag.").

10        Far from "do[ing] nothing," *Desimone*, 924 A.2d at 940, Plaintiffs' own allegations and the

11    documents on which they rely (which are incorporated by reference in the Complaint and appropriate

12    for the Court to consider on this Motion) demonstrate that, under the Board's oversight and supervision,

13    Block repeatedly took action in response to evolving compliance issues as Cash App's business

14    expanded.[6] As Plaintiffs acknowledge, the Board oversaw Block's █████████████████

15    ██████████████████████████████████████████████ in response to █████

16    ████████████████████████████████████ ¶ 105. This resulted in, for example, development

17    of █████████████████ which would ████████████████████████████████████

18    ██████████████████████████████ ¶ 135. The ARC and the full Board also regularly

19    oversaw Block's implementation of machine learning as a core aspect of compliance. *See, e.g.*, ¶ 97

20    (ARC materials "██████████████████████████████████████████████

21    ████████████████████████████████████████████████████████████

22    █████████); ¶ 99 (ARC informed that █████████████████████████████████

23    ████████████████████████████); ¶ 123 (Board informed that the ██████████████

24    ████████████████████████████████████████).

25

---

26    [6] It is appropriate for the Court to consider the documents Defendants request to incorporate by
     reference for the precise purpose that the incorporation by reference doctrine was created: to "prevent
27    plaintiffs from cherry-picking certain portions of documents that support their claims, while omitting
     portions that weaken their claims." *Mulquin v. Nektar Therapeutics*, 510 F. Supp. 3d 854, 863 (N.D.
28    Cal. 2020); *see also* RJN at 4.

Gibson, Dunn &
Crutcher LLP

The Board received reports that the Company's investment in ███████████████
██████████.  *See* Ex. U at 8 █████████████████████████████████████████████
█████████████████████████████████████); Ex. J at 5 (████████████████████████
███████████████████████████████████████████████████████████).  That
Board and ARC materials show Block continued to face unique and complex compliance challenges
during the relevant period does not mean the Board breached its duties.  *See Oklahoma Firefighters
Pension & Ret. Sys. v. Corbat*, 2017 WL 6452240, at *25 (Del. Ch. Dec. 18, 2017) ("challenging the
effectiveness" of board's response to red flags "is not enough to state a *Caremark* claim, because an
ineffective response does not, without more, indicate bad faith").   When compliance challenges
emerged, *see* ¶¶ 120, 131, the Board received reports of how Block was working to resolve them.  Ex.
Q at 12 ███████████████████████████████████████████████████████████████████
██████████████████████████████); Ex. H at 5 (███████████████████████████████
█████████████████████████████████████████████████████████████████████████████
██████); Ex. N at 9, Ex. O at 10 (██████████████████████████████████████████
██████████████████████████████████████████████████).  The documents Plaintiffs
quote from and rely on in the Complaint thus show the opposite of bad faith; they show a Board that
was engaged and overseeing a dynamic and evolving compliance system for a high-growth business.
*See In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 WL 4826104, at *23 (Del. Ch. Oct. 12, 2011)
(no bad faith in oversight when directors "cho[se] and implement[ed] a risk management system that
they presumably believed would keep them reasonably informed" of "objectively large risks");
*Richardson as Tr. of Richardson Living Tr. v. Clark*, 2020 WL 7861335, at *10 (Del. Ch. Dec. 31,
2020) (in rejecting *Caremark* claim, finding "implementing a particular fraud reduction software," even
if it "ultimately proved unsatisfactory," "demonstrates attention to risk, rather than disregard of it").

Plaintiffs fault the Board for allowing ██████████████████████████████████████
███████████████.  ¶¶ 175-186.  That is both misleading and beside the point.  The Board
was informed that ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████ Ex. K at 7.
The ARC also was made aware ████████████████████████████████████████████████████

BLOCK, INC.'S AND THE INDIVIDUAL DEFS.' MOT. TO DISMISS PURSUANT TO FRCP 23.1 AND 12(B)(6)
CASE NO. 5:25-CV-01262-NW

1     ████████████████████████████. Ex. Q at 11. Plaintiffs' second-guessing of these decisions

2     is insufficient to show the Board failed to exercise oversight. *See In re Goldman Sachs Grp., Inc.*

3     *S'holder Litig.*, 2011 WL 4826104, at *23. Plaintiffs also plead no particularized facts to support their

4     claim that ██████████████████████████████████████████████████████

5     ██████████████████████████████████ ¶¶ 184, 186. Nor could they, as the Board

6     was informed that ███████████████████████████████████████████████

7     ████████████████████████████████. Ex. U at 10 (██████████████████

8     ████████████████████████████████████████████████████████████

9     ██████████████). This record reflects the Company, under the Board's oversight, taking *action* in

10     response to complex and evolving compliance issues—a far cry from the necessary particularized facts

11     demonstrating the Board consciously turned a blind eye to known unlawful conduct. *See In re*

12     *Cognizant Tech. Sols. Corp. Derivative Litig.*, 2022 WL 4483595, at *6–8 (D.N.J. Sept. 27, 2022),

13     *aff'd*, 101 F.4th 250 (3d Cir. 2024) (dismissing *Caremark* claim where directors were "briefed on

14     issues" with the process for hiring subcontract workers in India, including global compliance, but also

15     were told of steps taken to "improve overall training compliance" for contractors).

16         None of the examples of supposed oversight failures identified in the Complaint, and

17     summarized below, come close to demonstrating that any director acted in bad faith by consciously

18     disregarding purported "red flags":

19         ***Suspicious Activity Reports (SARs) and Backlogs.*** Plaintiffs do not support their allegation

20     that ██████████████████████████████████████ ¶ 84. The documents

21     incorporated by reference make clear that the Board oversaw repeated efforts to address rising SARs.

22     Ex. N at 7 (████████████████████████████████████████████████

23     ████████████████████████████████████████████████████████████

24     ████████████████████████████████████████████████████████████

25     ████████████████████████████████████); Ex. R at 12 (████████████

26     ██████████████████████████████████████████). Plaintiffs also allege that Block did

27     ████████████████████████████████████ ¶¶ 95-97, 104, but the Board and ARC were told

28     that, among other strategies, ████████████████████████████████████

Gibson, Dunn &
Crutcher LLP

1

2   ████████████████████████████████, Ex. M at 11.  *See Reiter ex rel. Capital One*

3   *Fin. Corp. v. Fairbank*, 2016 WL 6081823, at *1, *3–4, *13 (Del. Ch. Oct. 18, 2016) (no *Caremark*

4   claim where "same reports that described" "heightened compliance risk simultaneously explained"

5   "initiatives management was taking to address those problems and to ameliorate [that] compliance

6   risk").  And the Complaint highlights increased SARs in Q3 2020 and Q2 2021, ¶¶ 87, 128, which,

7   besides coinciding with significant growth in Cash App, ¶ 91, reflected Block's efforts to evolve its

8   compliance systems.  Specifically, the ARC was informed that the increase in 2020 was the result of a

9

10

11   ██████, Ex. R at 12, 15; Ex. V at 14; *see also* Ex. N at 9–10 (████████████████████

12   ████████████████████████████████████).  The suspicious activity flagged

13   and reported to the Board strongly undercuts Plaintiffs' *Caremark* claim.  *See Stone*, 911 A.2d at 373

14   (affirming dismissal of *Caremark* claim where "the Board received and approved relevant policies and

15   procedures, delegated to certain employees and departments the responsibility for filing SARs and

16   monitoring compliance, and exercised oversight by relying on periodic reports from them").[7]

17   **Criminal Activity on Cash App.**  Plaintiffs allege that the Board "████████████

18   ████████████████████████████████████████████████████

19   ██████████████████ ¶ 174.  But Plaintiffs themselves admit that Block "████████

20   ██████████████████████████." ¶ 162.  For example, Plaintiffs allege that in

21   2019, the Board was informed that ████████████████████████████████████"

22

23   [7] Plaintiffs allege that certain technical issues related to SARs were "red flags."  However, the Company
     promptly addressed each issue.  For example, Plaintiffs allege that ████████████████████

24

25   ████████████ Ex. P at 8.  Plaintiffs claim that ████████████

26   ████████████████. ¶ 152.  But the ARC was told about this issue and informed that an

27   ██████████████." Ex. W at 17.  In other words, issues were identified and action was taken to
     remediate—the opposite of a "a sustained or systematic failure of the board to exercise oversight."

28   *South v. Baker*, 62 A.3d 1, 18 (Del. Ch. 2012).

████████████████████████████████████████████████████████████████████████

████████ ¶ 162. Plaintiffs claim this was Block's "only" response, but even if that were true—

which it is not, *see, e.g.*, Ex. Q at 7 ████████████████████████████████████

██████████████████████████████████████████)—it undercuts any claim

that the Board consciously "chose to do nothing." *Desimone*, 924 A.2d at 940. Indeed, the Complaint

is replete with allegations demonstrating the Board's oversight of Block's efforts to address criminal

activity on Cash App. *See, e.g.*, ¶ 135 (alleging Block ████████████████████████

███████████████████████████████████; ¶ 144 (alleging new ████████████

████████████████████████████████████████████████████).

The documents incorporated by reference in the Complaint likewise show that each time the

Board or ARC was informed of new, sophisticated forms of criminal activity on Cash App, they were

told that Block was taking aggressive steps to address the problem: ████████████████████

██████████████████████████████████████████████████, Ex.

R at 7; "████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████ Ex. H at 5; ████████████████████████████

████████████████████████████████ Ex. D at 7; ████████████████

████████████████████████████████████████████████████

████████████████ Ex. V at 13; █████████████████████████

██████████████████████████████ Ex. C at 7; ████████████████

████████████████████████████████████████████████████

████████████████████████████████████ Ex. X at 14; and

████████████████████████████████████████████████████

████████████████████████████ Ex. I at 5-6, 12. "[T]hat the directors' good faith

exercise of oversight responsibility may not invariably prevent" all bad actor misconduct *does not* mean

the directors face a substantial likelihood of liability for breaching their *Caremark* duties. *Stone*, 911

A.2d at 373; *see Desimone*, 924 A.2d at 940 ("Delaware courts routinely reject the conclusory

1    allegation that because illegal behavior occurred, internal controls must have been deficient, and the

2    board must have known so.").

3        ***Staffing.***  Plaintiffs' allegation that the Board failed to address ████████████████

4    ███████████████ ¶ 271, also fails to support a *Caremark* theory and is contradicted by the

5    documents on which they rely.  In fact, the incorporated documents show the Board consistently was

6    informed that Block was investing significantly in compliance staffing.  *See, e.g.*, Ex. L at 8 ████████

7    █████████████████████████████); Ex. R at 10 (

8    ████████████████████████); Ex. Q at 13-14 (████████████

9    ███████████████████████████████████████████

10   ████████████████████████████████████).  To the

11   extent understaffing was a "red flag," the record shows that the Board oversaw action to address it.

12       ***Other Compliance Actions.***  Plaintiffs allege that certain compliance decisions constituted "red

13   flags," yet they neglect critical context contained in the documents incorporated by reference that easily

14   refutes their claims.  Plaintiffs first allege that Block "████████████████████████

15   █████████████████ ¶ 275.  But Plaintiffs do not allege any facts showing that ████████

16   ███ s violated Block's legal obligations.  Nor could they.  The Board was informed that the Company

17   ██████████████████████████████████████ Ex. Q at 14

18   ████████████████████████████████████████████

19   ████████████████████████████ Plaintiffs further claim that Block

20   █████████████████ which allowed criminal activity to proliferate.  ¶ 84.  Again, not so, as the

21   documents on which Plaintiffs rely show.  Instead, the Board was told that Block adjusted its risk

22   controls to █████████████████████████████████████

23   █████████████████████.  Ex. N at 5; Ex. T at

24   14-15.[8]  Plaintiffs also claim that Block changed its ████████████████████

25   ─────────────────
     [8] Plaintiffs misleadingly place the term "████," in quotation marks even where the cited documents
26   do not use this term.  *See, e.g.*, ¶¶ 104, 119.  The documents that purportedly demonstrate a ████████
27   ███████████████████████████████████████ Ex. N at 7 n.7
     ████████████████████████████████████████████████
28   ████████████ ; Ex. Q at 11 ██████████████████████ ; Ex, Q at 14

─────────────────
                                            15

Gibson, Dunn &
Crutcher LLP

¶ 111.  But as the documents on which Plaintiffs rely show, the Board oversaw Block's subsequent efforts to " ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ " ¶ 140.[9]

Plaintiffs fail to plead particularized facts demonstrating that a majority of directors acted in bad faith and knew that they were not discharging their fiduciary duties, at most disagreeing with the Board's oversight decisions.  This is insufficient to plead a *Caremark* claim, let alone to demonstrate a substantial likelihood of liability under *Caremark* that is sufficient to excuse demand.

### 2.    Plaintiffs' Ancillary *Caremark* Theories as to Certain Defendants Also Fail

Plaintiffs claim that Mr. Botha and Mr. Deighton face a substantial likelihood of *Caremark* liability because they sat on the ARC.  But neither director faces unique *Caremark* duties simply because they sat on a Board committee that helped oversee compliance.  *Rattner v. Bidzos*, 2003 WL 22284323, at *12–13 (Del. Ch. Oct. 7, 2003) (rejecting allegations that directors who served on Audit Committee faced "a substantial likelihood of liability for failing to oversee [the company]'s compliance with required accounting and disclosure standards").  And as explained above, Plaintiffs' own allegations and the ARC's documents reflect ARC oversight, not inaction.  *See, e.g., supra* at 10–12.

Plaintiffs also allege that Mr. Dorsey faces a substantial likelihood of liability for breaching his fiduciary duties as an officer, because he was responsible for Block's "decision to loosen compliance efforts in order to accelerate growth."  ¶ 276.  But, as set forth above, the Complaint pleads no facts to support such "loosening," and the Complaint lacks any factual allegations to support an inference that Mr. Dorsey ignored "red flags" in his role as CEO (or as a director).  Accordingly, Plaintiffs fail to plead that Mr. Dorsey faces a substantial likelihood of liability for breaching his *Caremark* duties as

_____

████████████████████████ ).  The Complaint contains no particularized allegations that these decisions were inconsistent with the Board's duty in overseeing the compliance program.

[9] Plaintiffs also allege that on February 12, 2019, the ARC was informed that Block was ██████ ████████████████████████████  ¶ 93.  In fact, the documents show that the ARC was informed on this date that Block had ███████████████████████████████████████████████████████████ ██████████████████████████████████████████████████  Ex. Z at 5–6.

an officer.  *See Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1288 (Del. 1994) (rejecting fiduciary duty claims against officer and director where plaintiff "failed to highlight any specific actions [the officer] undertook as an officer (as distinct from actions as a director)"); *McDonald's Corp. S'holder Deriv. Litig.*, 289 A.3d 343, 369 (Del. Ch. 2023) (officers owe context-specific "duties of oversight comparable to those of directors").

**B.    Plaintiffs Do Not Adequately Allege that Mr. Dorsey and Mr. McKelvey Face a Substantial Likelihood of Liability for, or Materially Benefited from, Insider Trading**

Delaware law "sets the bar for stating a claim . . . based on insider trading very high."  *In re Camping World Hold., Inc. S'holder Deriv. Litig.*, 2022 WL 288152, at *9 (Del. Ch. Jan. 31, 2022) (citation omitted).  To state a claim "that a corporate fiduciary breached his fiduciary duties by engaging in insider trading—a so-called *Brophy* claim—a plaintiff 'must show that: 1) the corporate fiduciary possessed material, nonpublic company information; and 2) the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information.'"  *In re Vaxart, Inc. S'holder Litig.*, 2021 WL 5858696, at *22 (Del. Ch. Nov. 30, 2021) (quoting *Kahn v. Kolberg Kravis Roberts & Co., L.P.*, 23 A.3d 831, 838 (Del. 2011)).  "Particularized facts—not speculation—must be pleaded to support a rational inference of scienter." *Camping World*, 2022 WL 288152, at *12.  An inference of scienter does not exist where, for example, there is a lack of temporal proximity between the trades and "the time [the fiduciary] learn[ed] of material, nonpublic information"; the trades "represent[] a very small fraction of" the fiduciary's "overall stake" in the company; and the fiduciary traded in a "consistent pattern."  *In re Clovis Oncology, Inc. Derivative Litig.*, 2019 WL 4850188, at *15–16 (Del. Ch. Oct. 1, 2019).

Plaintiffs' allegations fail to support an inference of scienter.[10]  Every single sale of stock challenged in the Complaint was made pursuant to a Rule 10b5-1 plan.  Lutz Decl. Exs. AA, BB.  Rule 10b5-1 plans "offer a safe harbor for corporate insiders to sell stock" by "giv[ing] trading authority to

---

[10] Plaintiffs also fail to plead particularized facts showing that at the time of the challenged trades, Mr. Dorsey or Mr. McKelvey possessed adverse information about Block's compliance that was materially different than public information.  *See In re Camping World Hold., Inc.*, 2022 WL 288152, at *11 (dismissing *Brophy* claim in part because court "will not credit conclusory allegations that the defendants 'must have obtained some additional, material nonpublic information' because of their roles as fiduciaries") (internal citation omitted).

third parties[.]" *Cent. Laborers' Pension Fund v. Karp*, 2025 WL 1213104, at *15 (Del. Ch. Apr. 25, 2025) (internal quotations marks and citation omitted) (finding no substantial likelihood of liability for *Brophy* claim based on trades made pursuant to 10b5-1 plans).  The size and timing of the challenged trades, generally 100,000 shares per week for Mr. Dorsey and 200,000 shares per week for Mr. McKelvey, were consistent with their prior 10b5-1 plans.  ¶¶ 246-47; Lutz Decl. Exs. CC, DD; *see In re TrueCar, Inc. S'holder Derivative Litig.*, 2020 WL 5816761, at *26 (Del. Ch. Sept. 30, 2020) (dismissing *Brophy* claim where complaint lacked "well-pled facts" that trades "represented a deviation from . . . , past trading practices").  Moreover, even after the trades identified in the Complaint, ¶¶ 246-47, Mr. Dorsey still owned more than 49 million shares and Mr. McKelvey owned more than 13 million. Lutz Decl. Ex. EE.  Where, as here, a "defendant sells only a small portion of [his] holdings and retains a huge stake in the company, then it is difficult reasonably to infer []he was fleeing disaster or seeking to make an unfair buck."  *In re Clovis Oncology*, 2019 WL 4850188, at *15 (internal quotation marks and citation omitted).  Because Plaintiffs fail to plead the kinds of "unusually large, suspiciously timed trades that allow a reasonable inference of scienter," *id.*, they fail to plead that either Mr. Dorsey or Mr. McKelvey face a substantial likelihood of liability for insider trading.

## C.    Plaintiffs Fail to Allege Facts Showing that the Demand Board Lacks Independence.

Plaintiffs fail to plead that either Mr. Dorsey or Mr. McKelvey face a substantial likelihood of liability or received a material personal benefit from wrongdoing, thus the Court need not consider Plaintiffs' argument under the third *Zuckerberg* prong that other members of the Board are beholden to Mr. Dorsey and Mr. McKelvey.  If, however, the Court reaches this inquiry, Plaintiffs fail to adequately allege that demand is futile as to a majority of the members of the Demand Board based on a lack of independence.  To rebut the presumption of independence, Plaintiffs must allege "with particularity facts creating a reasonable doubt" that directors were "so beholden to an interested director that [their] discretion would be sterilized." *Zuckerberg*, 262 A.3d at 1060 (cleaned up).  "[T]o render a director unable to consider demand, a relationship must be" "sufficiently substantial" and "of a bias-producing nature."  *Id*. at 1061.  Allegations of a "personal friendship," an "outside business relationship," or "financial ties," without more, are "insufficient to raise a reasonable doubt" that a director lacks independence. *Id*.  Plaintiffs fall far short of satisfying their burden.

1

### 1.    Mr. Dorsey and Mr. McKelvey

2    Plaintiffs claim that because Mr. Dorsey and Mr. McKelvey "jointly possessed over 50% of the

3    Company's total voting power," and Mr. Dorsey was a "controlling shareholder," each member of the

4    Demand Board lacks independence from one or both of them.  ¶¶ 281-282.  Not so.  Voting power

5    alone "does not automatically mean that the other [directors] are incapable of exercising judgment."

6    *Ocegueda on behalf of Facebook v. Zuckerberg*, 526 F. Supp. 3d 637, 648 (N.D. Cal. 2021) (alteration

7    in original) (citation omitted).

8    Plaintiffs also allege that Mr. Dorsey and Mr. McKelvey are beholden to each other because

9    they co-founded Block.  This bare allegation of a co-founder relationship also fails.  *Apple Computer,*

10    *Inc. v. Exponential Tech.*, Inc., 1999 WL 39547, at *12 (Del. Ch. Jan. 21, 1999) (rejecting allegation

11    that co-founders lacked independence from one another); *see also Orman v. Cullman*, 794 A.2d 5, 27

12    (Del. Ch. 2002) ("previous business relationship is not enough" to show lack of independence).

13    Plaintiffs next allege that Mr. Dorsey and Mr. McKelvey "owe a large part of their respective

14    wealth to Block and that without each other, Block would not exist."  ¶¶ 285, 289.  But Plaintiffs plead

15    no specific facts demonstrating any "relationship" or "additional circumstances other than . . . stock

16    ownership" that would cause either to "be more willing to risk his or her reputation than risk the

17    relationship with the interested director."  *Beam*, 845 A.2d at 1052.  "If anything, the only reasonable

18    inference that can be drawn" "is that the shareholder-director in question is an economically rational

19    individual whose priority is to protect the value of his shares."  *Zimmerman ex rel. Priceline.com, Inc.*

20    *v. Braddock*, 2002 WL 31926608, at *9 (Del. Ch. Dec. 20, 2002) (cleaned up).

21    Plaintiffs point to a comment from Mr. McKelvey in 2020 that he and Mr. Dorsey have been

22    "friends and colleagues" since they met.  This is hardly the type of "familial" relationship required to

23    rebut the presumption of independence.  ¶¶ 284, 289; *Beam*, 845 A.2d at 1050; *Zuckerberg*, 262 A.3d

24    at 1062–63 (allegations that "Thiel is Zuckerberg's close friend and mentor," "one of the early investors

25    in Facebook, [and] is its longest-tenured board member besides Zuckerberg," did not show lack of

26    independence) (internal quotation marks omitted); *Crescent/Mach I Prs, L.P. v. Turner*, 846 A.2d 963,

27    980–81 (Del. Ch. 2000) (allegations of "long-standing 15-year professional and personal relationship"

28    insufficient to defeat independence).

Gibson, Dunn &
Crutcher LLP

1

## 2.    Ms. Meeker

2      Plaintiffs allege that Ms. Meeker is beholden to Mr. Dorsey and Mr. McKelvey because the

3   firm where she serves as a General Partner led a financing round for Block in June 2011 that led to Ms.

4   Meeker being named to the Board.    ¶¶ 310-312.    Plaintiffs allege that because Mr. Dorsey and

5   Mr. McKelvey "were reliant on the financing from" Ms. Meeker's firm, she is not impartial.  ¶¶ 311-

6   312.  But Plaintiffs get the independence standard backwards; they need specific facts that Ms. Meeker

7   is beholden to Mr. Dorsey and Mr. McKelvey, not the other way around.  Regardless, membership on

8   a board does not rebut the presumption of independence absent allegations that the board seat is

9   material to a director personally.  *In re Trade Desk, Inc. Derivative Litig.*, 2025 WL 503015, at *10

10  (Del. Ch. Feb. 14, 2025) ("A derivative plaintiff cannot successfully rebut the presumption of a

11  director's ability to consider demand by simply alleging the director was elected or appointed by an

12  interested party. . . .").  Plaintiffs allege no such facts as to Ms. Meeker.

13

## 3.    Mr. Botha

14      Plaintiffs allege that Mr. Botha is beholden to Mr. Dorsey and Mr. McKelvey because he served

15  in "various positions" at Sequoia Capital, a firm that led a $27.5 million round of funding for Block in

16  2011 that led to Mr. Botha being named to the Block Board.  ¶ 293.  Like Ms. Meeker, Plaintiffs claim

17  Mr. Dorsey and Mr. McKelvey were "reliant on the financing from Sequoia" to scale the company.  *Id.*

18  These allegations as to Mr. Botha fail for the same reason as Ms. Meeker.

19      Plaintiffs also claim that Mr. Botha is beholden to Mr. Dorsey because Elon Musk, a business

20  contact of Mr. Botha's, took over Mr. Dorsey's former company, Twitter, in a transaction financed in

21  part by Sequoia.    ¶¶ 294-96.    Allegations that Mr. Botha and Mr. Dorsey share a contact do not

22  demonstrate that they have a personal or business relationship outside the Board, let alone a relationship

23  so close that Mr. Botha is incapable of acting independently.  *See Beam*, 845 A.2d at 1051 (allegations

24  that directors and controller "moved in the same social circles, attended the same weddings, developed

25  business relationships before joining the board, and described each other as 'friends,' even when

26  coupled with [controller's majority] voting power, are insufficient, without more, to rebut the

27  presumption of independence").  Plaintiffs' contention that Mr. Dorsey and Sequoia participated in the

28  Twitter transaction also fails to establish a lack of independence, particularly absent particularized

20

allegations that the transaction materially benefitted Mr. Botha.  *See Olenik v. Lodzinski*, 2018 WL 3493092, at *17 (Del. Ch. July 20, 2018) (director did not lack independence because he invested in companies purportedly led by interested director and would "wish[] to maintain a good relationship with [the interested director]"), *aff'd in part*, *rev'd in part on other grounds*, 208 A.3d 704 (Del. 2019).

### 4.    Mr. Eisen

Plaintiffs allege that Mr. Eisen co-founded Afterpay, which Block acquired in 2021, resulting in Mr. Eisen receiving Block equity.  ¶¶ 314-317.  Plaintiffs allege that Mr. Eisen is beholden to Mr. Dorsey and Mr. McKelvey because their voting power ensured approval of the Afterpay acquisition.  ¶ 316. They also allege that Mr. Eisen lacks independence from Mr. Botha, Ms. Brooks, Mr. Carter, Mr. Deighton, Mr. Garutti, and Ms. Meeker, who approved the acquisition.  ¶ 321.  But Plaintiffs point to no facts suggesting that Block's "acquisition [of Afterpay] was anything other than a business deal that benefitted both parties."  *In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, 922 F. Supp. 2d 445, 471 (S.D.N.Y. 2013), *aff'd sub nom. In re Facebook, Inc., Initial Pub. Offering Deriv. Litig.*, 797 F.3d 148 (2d Cir. 2015).  Courts have found that similar business deals do not create a lack of independence.  *See, e.g.*, *In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 WL 4826104, at *12 (rejecting claim that Goldman Sachs director lacked independence because he was Chairman and CEO of a company that received billions of dollars in financing from Goldman).  Nor does the Complaint plead particularized facts about the approval process or Mr. Eisen's personal or business relationships with *any* director.

## D.    Even If Demand Were Excused, the Complaint Must Be Dismissed Under Rule 12(b)(6) for Failure to State a Claim.

Given the Complaint's fatal defects under Rule 23.1, the Court need not consider the merits of Plaintiffs' claims.  If it does, the Court should dismiss the Complaint for failure to state a claim.

### 1.    Plaintiffs Fail to State a Claim for Breach of Fiduciary Duty or Insider Trading.

As set forth above, Plaintiffs fail to state a *Caremark* claim against any Defendant.  Section IV.A, *supra*.  For the reasons explained, Section IV.B, *supra*, Plaintiffs' *Brophy* claim also fails.

1

2.    **Plaintiffs Fail to State any Claims Under the Exchange Act.**

2        Plaintiffs' Exchange Act claims have no place in this derivative action.  Derivative actions

3    relate to the internal affairs of a corporation, and only the law of the state of incorporation—here,

4    Delaware—governs issues relating to a corporation's internal affairs.  *See VantagePoint Venture*

5    *Partners 1996 v. Examen, Inc.*, 871 A.2d 1108, 1113 (Del. 2005).  Thus, Plaintiffs should not be

6    permitted to proceed derivatively with non-Delaware state law claims.[11]  The Exchange Act claims

7    also are duplicative of the direct claims pending before this Court in *Gonsalves v. Block*, No. 25-cv-

8    00642 (N.D. Cal), in which the Court already has appointed lead plaintiffs and the motion to dismiss

9    is being briefed simultaneously.  *See Lee v. Fisher*, 70 F.4th 1129, 1140 (9th Cir. 2023) (dismissing

10    derivative Section 14(a) claim pursuant to forum selection clause, noting that plaintiff could bring

11    direct claims in federal court).  As explained in Defendants' concurrently filed motion to dismiss on

12    *forum non conveniens* grounds, the Exchange Act claims are a transparent bid to dodge Block's bylaw

13    provision requiring derivative claims to be brought in Delaware Chancery Court.  Such forum shopping

14    needlessly burdens the Court and the parties with duplicative litigation.  The Court should dismiss the

15    Exchange Act claims for this reason, and because Plaintiffs fail to plead viable claims in any event.

16        a.    **Plaintiffs Fail to State a Claim Under Section 10(b).**

17        Plaintiffs bring a Section 10(b) claim alleging that Individual Defendants caused Block to

18    repurchase stock at prices inflated by misstatements made or approved by them.  To establish a Section

19    10(b) violation, Plaintiffs must show that Individual Defendants made a material misstatement or

20    omission, with an intent to defraud, in connection with the purchase or sale of a security, and Plaintiffs

21    relied on the misstatement, causing an economic loss.  *Zucco Partners, LLC v. Digimarc Corp.*, 552

22    F.3d 981, 990 (9th Cir. 2009), *as amended* (Feb. 10, 2009).  Here, because Plaintiffs purport to bring

23

24    [11] The Ninth Circuit explained in *Lee v. Fisher* that recent Supreme Court jurisprudence "casts grave doubt on whether a shareholder can bring a derivative § 14(a) action on behalf of a corporation."  70 F.4th 1129, 1146, 1149.  Specifically, the court reasoned that violations of Section 14(a)—a statute designed to protect the voting rights of *stockholders*—does not directly harm the corporation, which is the focus of a derivative action.  *Id.*  The Supreme Court also "now looks to state law rather than federal common law to fill in gaps relating to federal securities claims, and under Delaware law, a § 14(a) action is direct, not derivative."  *Id.*  Further, "[b]ecause the shareholders, not the corporation itself, vote to approve corporate transactions . . . the corporation lacks standing to sue under § 14(a) for a misleading proxy statement it has issued to its own shareholders."

25

26

27

28

Section 10(b) claims derivatively on behalf of Block, they must allege that *Block* relied on its own and its directors' alleged misstatements in repurchasing its shares. As the District of Delaware held in *Elfers v. Gonzalez*, 2020 WL 7264272 (D. Del. Dec. 10, 2020), this is not a viable theory.

In *Elfers*, the court dismissed Section 10(b) claims brought derivatively, where the plaintiff alleged that directors approved stock repurchases at artificially inflated prices while allegedly concealing from the public that the company faced liability. 2020 WL 7264272 at *1-2. The *Elfers* court held that plaintiff's theory was not cognizable under Section 10(b) because the corporation, acting through its directors, could not "literally be deceived" by its own directors. *Id.* at *3; *see also Franklin v. Doheny*, 2022 WL 2064972, at *2 (D. Del. June 8, 2022), *adopted*, 2022 WL 3099235 (D. Del. June 23, 2022) (theory "that the defendant directors spread misleading information and then the same directors relied on and were deceived by that false information when they approved stock buy backs," was not actionable under Section 10(b)); *In re Verisign, Inc. Deriv. Litig.*, 531 F. Supp. 2d 1173, 1209 (N.D. Cal. 2007) (dismissing Section 10(b) claim where "plaintiffs allege that all the senior management and board members not only knew about the alleged backdating but also caused it").

Even if their theory was viable, Plaintiffs fail to adequately plead that any Individual Defendant made a false or misleading statement or acted with intent to defraud. Both elements must be pleaded with particularity and are subject to the heightened pleading standard of the PSLRA. *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012). Plaintiffs first challenge general statements made by Defendants describing Block's compliance program. But allegedly omitted facts relating to the *effectiveness* of the compliance program do not call into question the truth of these plain statements. *See, e.g.*, ¶¶ 73, 78. Moreover, such statements are "inherently aspirational" expressions of optimism and not actionable under federal securities laws. *See Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1276 (9th Cir. 2017). Plaintiffs also challenge statements concerning Block's performance on grounds that Cash App's "transacting actives" metric concealed from investors that it included multiple accounts associated with a single person. ¶¶ 192, 193. But Block never purported to disclose unique individual users on its platform, or unique active users. Rather, as fully disclosed to investors, Block's growth metrics counted active accounts, and the Company told investors in its SEC filings and elsewhere that "transacting actives" could include

23

multiple accounts created by a single individual, such as "families sharing one alias identifier or one customer with multiple accounts." Lutz. Decl. Exs. FF, GG, HH. Plaintiffs also fail to adequately plead scienter because their own allegations and the documents incorporated by reference demonstrate the Board's careful oversight over the compliance program, *see supra* Section IV.A. Plaintiffs further fail to allege any facts demonstrating the alleged misstatements were made with an intent to defraud, let alone facts pleaded in "great detail." *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999).

### b.    Plaintiffs Fail to State a Claim Under Section 14(a).

To state a claim under Section 14(a), Plaintiffs must plead that (1) defendants made a material misrepresentation or omission in a proxy statement; (2) with the requisite state of mind; and (3) that the proxy statement was the transactional cause of harm of which plaintiff complains. *In re HP Deriv. Litig.*, 2012 WL 4468423, at *10 (N.D. Cal. Sept. 25, 2012). "Plaintiff must also plead that the misstatement or omission was an essential link in the accomplishment of the proposed transaction." *Id*. Because the Section 14(a) claim sounds in fraud, *see* ¶¶ 327, 328, Plaintiffs must meet the heightened pleading standards of Rule 9(b) and the PSLRA. Plaintiffs' claim fails under any standard.

Plaintiffs allege that misstatements in Block's proxy statements caused shareholders to elect directors who then engaged in purported mismanagement. ¶¶ 248–254. This theory fails at the outset because the alleged misstatement or omission was not an essential link to any harmful "transaction." Damages are recoverable under Section 14(a) "only when the votes for a specific corporate transaction requiring shareholder authorization . . . are obtained by a false proxy statement, and that transaction was the direct cause of pecuniary injury for which recovery is sought." *In re Verisign, Inc. Deriv. Litig.*, 531 F. Supp. 2d at 1213. Here, the directors' alleged conduct—*not* the shareholder vote—allegedly damaged Block. This does not suffice under Section 14(a), and courts in this district have routinely rejected identical theories of harm. *See, e.g., In re HP Derivative Litig.*, 2012 WL 4468423, at *11 ("[T]he mere fact that omissions in proxy materials, by permitting directors to win re-election, indirectly lead to financial loss through mismanagement will not create a sufficient nexus with the alleged monetary loss.") (citation omitted); *In re Diamond Foods, Inc. Deriv. Litig.*, 2012 WL 1945814, at *7 (N.D. Cal. May 29, 2012) ("A claim that the reelection of the directors was an essential link to

loss-generating corporate action because of the directors' subsequent mismanagement cannot form the basis of liability under Section 14(a).") (internal quotation marks omitted); *Paypal*, 2018 WL 466527, at *4 ("[A]lleging generally that the mere election of directors was an essential link to" "subsequent wrongdoing does not satisfy Section 14(a)'s requirements"). Nor is Plaintiffs' theory cognizable that alleged proxy misrepresentations led Block to hire and compensate directors who engaged in purported wrongdoing. ¶¶ 255–261. *Ocegueda*, 526 F. Supp. 3d at 652 ("conclusory allegations" of "harm in the form of reelection of directors [and] the approval of compensation to directors who helped perpetuate the unlawful practices" did not establish causation).

The Complaint also fails to identify any actionable false or misleading statements. Plaintiffs contend that the proxies omitted the Board's alleged failure to oversee compliance despite being told of shortcomings, but the alleged omissions do not render statements in the proxies concerning Board oversight—such as statements that the Board "routine[ly] evaluat[es]" "processes used to identify, assess, monitor and report on risks" and has "implemented a multi-layered approach" to "ensure" "areas of focus are discussed in detail" with "a full understanding of the applicable risk"—false or misleading. ¶¶ 248, 251. Indeed, the record shows those statements were true. Section IV.A, *supra*.

### c.    Plaintiffs Fail to State a Claim Under Section 29(b)

Section 29(b) allows a court to rescind or void a contract that "either violated securities law when it was made or required a violation of securities law in its performance." *Drulias v. Guthrie*, 2019 WL 13240415, at *7 (C.D. Cal. Oct. 23, 2019) (emphasis removed). Because the Complaint does not state a claim for securities fraud, the Section 29(b) claim fails. *See Ellusionist Cash Balance Plan & Tr. v. Spiegel Acct. Corp.*, 2024 WL 4294645, at *10 (N.D. Cal. Sept. 24, 2024) (Section 29(b) claim "cannot lie where, as here, the allegations of the underlying violation fail"). In any event, the Complaint does not allege the existence of specific contracts to be rescinded. The claim thus fails.

### V.    CONCLUSION

For the foregoing reasons, the Court should dismiss this action with prejudice.

Dated: July 28, 2025

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: /s/ Brian M. Lutz

Brian M. Lutz, SBN 255976
blutz@gibsondunn.com
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: 415.393.8200

Jessica Valenzuela, SBN 220934
jvalenzuela@gibsondunn.com
310 University Avenue
Palo Alto, CA 94301
Telephone: 650.849.5300

Colin B. Davis, SBN 273942
cdavis@gibsondunn.com
3161 Michelson Drive, Suite 1200
Irvine, CA 92612
Telephone: 949.451.3800

*Attorneys for Defendants Dorsey, Ahuja, Botha, Brooks, Carter, Deighton, Garutti, McKelvey, Meeker, Patterson, Rothstein, Summers, and Viniar and Nominal Defendant, Block, Inc.*

BLOCK, INC.'S AND THE INDIVIDUAL DEFS.' MOT. TO DISMISS PURSUANT TO FRCP 23.1 AND 12(B)(6)
CASE NO. 5:25-CV-01262-NW

Gibson, Dunn &
Crutcher LLP