Jason M. Leviton (*pro hac vice*)
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600
jason@blockleviton.com

*Co-lead Counsel for Plaintiffs*

[Additional Counsel Appear on Signature Page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

|  |  |
|---|---|
| IN RE BLOCK INC. SHAREHOLDER DERIVATIVE LITIGATION<br><br>This Document Relates to:<br><br>ALL ACTIONS | Case No. 5:25-cv-01262-NW<br><br>**LEAD PLAINTIFF'S OPPOSITION TO BLOCK INC.'S AND THE INDIVIDUAL DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT PURSUANT TO FED. R. CIV. P. 23.1 AND 12(b)(6)**<br><br>Date: November 12, 2025<br>Time: 9:00 a.m.<br>Place: Courtroom 3, 5th Floor<br><br>Judge: Hon. Noël Wise |

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................1

FACTUAL BACKGROUND ..............................................................................3

    I.      Company Background ..........................................................................3

    II.     Block's Regulatory Compliance Violations .......................................3

    III.    Harms to the Company ........................................................................5

LEGAL STANDARD ..........................................................................................6

ARGUMENT ........................................................................................................7

    I.      Demand is Excused Because a Majority of the Demand Board
          Faces a Substantial Likelihood of Liability ......................................7

          A.     A Majority of the Demand Board Faces a Substantial
                 Likelihood of Liability Under *Caremark*......................................7

          B.     Dorsey and McKelvey Face a Substantial Likelihood of
                 Liability Under *Brophy*................................................................15

    II.     Demand is Excused Because a Majority of the Demand Board
           Lacks Independence from Dorsey and McKelvey................................17

          A.     Dorsey and McKelvey ...................................................................18

          B.     Meeker ...........................................................................................19

          C.     Botha ..............................................................................................20

          D.     Eisen ..............................................................................................20

    III.    The Complaint States Claims Under Rule 12(b)(6)............................21

          A.     The Complaint States Claims Under *Caremark* and *Brophy*.....................21

          B.     The Complaint States Claims Under the Exchange Act .............................21

1.    The Complaint States a Section 10(b) Claim.................................21

2.    The Complaint States a Section 14(a) Claim...............................23

3.    The Complaint States a Section 29(b) Claim...............................24

CONCLUSION............................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## **Cases**

*Arduini v. Hart*,
774 F.3d 622 (9th Cir. 2014) ..........................................................................................6

*Azar v. Yelp, Inc.*,
2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) ..............................................................17

*In re Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ........................................................................................23

*Brophy v. Cities Serv. Co.*,
70 A.2d 5 (Del. Ch. 1949)................................................................................15, 18, 21

*Clem v. Skinner*,
2024 WL 668523 (Del. Ch. Feb. 19, 2024) ..................................................................12

*Del. Cnty. Emps. Ret. Fund. v. Sanchez*,
124 A.3d 1017 (Del. 2015) ................................................................7, 17, 18, 19

*Facebook, Inc. v. Pac. Nw. Software, Inc.*,
640 F.3d 1034 (9th Cir. 2011) ......................................................................................24

*Grabski ex rel. Coinbase Global, Inc. v. Andreessen*,
2024 WL 390890 (Del. Ch. Feb. 1, 2024) ..............................................................16, 17

*In re Am. Int'l Grp., Inc.*,
965 A.2d 763 (Del. Ch. 2009)........................................................................................16

*In re Amtel Corp. Derivative Litig.*,
2008 WL 2561957 (N.D. Cal. June 25, 2008) ..............................................................21

*In re Asyst Techs., Inc. Derivative Litig.*,
2008 WL 4891220 (N.D. Cal. Nov. 12, 2008) ........................................................24, 25

*In re BGC P'rs, Inc. Derivative Litig.*,
2021 WL 4271788 (Del. Ch. Sept. 20, 2021) ..............................................................17

*In re Boeing Co. Derivative Litig.*,
2021 WL 4059934 (Del. Ch. Sept. 7, 2021) ....................................................................8

*In re Camping World Holdings,*
2022 WL 288152 (Del. Ch. Jan. 31, 2022) .......................................................16

*In re Clovis Oncology, Inc. Derivative Litig.,*
2019 WL 4850188 (Del. Ch. Oct. 1, 2019) ..................................................13, 17

*In re Cornerstone Therapeutics Inc., S'holder Litig.,*
115 A.3d 1173 (Del. 2015) ...............................................................................8

*In re Countrywide Fin. Corp. Derivative Litig.,*
554 F. Supp. 2d 1044 (C.D. Cal. 2008) .....................................................22, 23, 24

*In re Finisar Corp. Derivative Litig.,*
2012 WL 2873844 (N.D. Cal. July 2012) ..........................................................22

*In re Fox Corp. Derivative Litig.,*
2024 WL 5233229 (Del. Ch. Dec. 27, 2024) .......................................................20

*In re Match Grp., Inc. Derivative Litig.,*
315 A.3d 446 (Del. 2024) .................................................................................20

*In re McDonald's Corp. S'holder Derivative Litig.,*
291 A.3d 652 (Del. Ch. 2023) ...........................................................................13

*In re Oracle Corp. Derivative Litig.,*
824 A.2d 917 (Del. Ch. 2003) ...........................................................................20

*In re Oracle Corp.,*
867 A.2d 904 (Del. Ch. 2004) ...........................................................................16

*In re Verisign, Inc. Derivative Litig.,*
531 F. Supp. 2d 1173 (N.D. Cal. 2007) ............................................................22

*In re Wells Fargo & Co. S'holder Derivative Litig.,*
282 F. Supp. 3d 1074 (N.D. Cal. 2017) ........................................................24, 25

*Kang v. PayPal Holdings, Inc.,*
620 F. Supp. 3d 884 (N.D. Cal. 2022) ...........................................................6, 9

*Kelly v. Dorsey et al.,*
No. 4:25-cv-03615-KAW (N.D. Cal. Apr. 24, 2025) ...........................................1

*Khoja v. Orexigen Therapeutics, Inc.,*
899 F.3d 988 (9th Cir. 2018) ........................................................................6, 13

*La. Mun. Police Emps.' Ret. Sys. v. Pyott*,
46 A.3d 313 (Del. Ch. 2012)............................................................................7

*Lacey v. Maricopa Cnty.*,
693 F.3d 896 (9th Cir. 2012) ........................................................................23

*Lamartina v. VMware, Inc.*,
2021 WL 4133851 (N.D. Cal. Sept. 10, 2021) ............................................17

*Lebanon County Employees' Retirement Fund v. Collis*,
2022 WL 17841215 (Del. Ch. Dec. 22, 2022)..............................................11

*Marchand v. Barnhill*,
212 A.3d 805 (Del. 2019) .......................................................................18, 20

*McElrath v. Kalanick*,
224 A.3d 982 (Del. 2020) ..............................................................................18

*N.Y. City Emps.' Ret. Sys. v. Jobs*,
593 F.3d 1018 (9th Cir. 2010) ......................................................................23

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) ......................................................................23

*Ontario Provincial Council of Carpenters' Pension Tr. Fund v. Walton*,
2023 WL 3093500 (Del. Ch. Apr. 26, 2023) ...............................................13

*Pettry ex rel. FedEx Corporation v. Smith*,
2021 WL 2644475 (Del. Ch. June 28, 2021)................................................12

*Rales v. Blasband*,
634 A.2d 927 (Del. 1993) ................................................................................7

*Rich ex rel. Fuqi Int'l, Inc. v. Chong*,
66 A.3d 963 (Del. Ch. 2013)............................................................................8

*Rosenbloom v. Pyott*,
765 F.3d 1137 (9th Cir. 2014) ........................................................................6

*Sandys v. Pincus*,
152 A.3d 124 (Del. 2016) ...............................................................18, 19, 20

*Schueneman v. Arena Pharms., Inc.*,
840 F.3d 698 (9th Cir. 2016) ..................................................................21, 23

*Shaev v. Baker*,
2017 WL 1735573 (N.D. Cal. May 4, 2017) ...........................................................22

*Stone v. Ritter*,
911 A.2d 362 (Del. 2006) ........................................................................................8

*Teamsters Local 443 Health Svcs. & Ins. Plan v. Chou*,
2020 WL 5028065 (Del. Ch. Aug. 24, 2020) ...........................................8, 11, 12, 13

*United Food & Com. Workers Union v. Zuckerberg*,
250 A.3d 862 (Del. Ch. 2020)...........................................................................13, 14

*United Food & Com. Workers Union & Participating Food Indus.*
*Emps. Tri-State Pension Fund v. Zuckerberg*,
262 A.3d 1034 (Del. 2021) ...........................................................................6, 7, 15

**Other Authorities**

15 U.S.C. § 78cc(b)...............................................................................................24

12 C.F.R. § 353.3(a)(2)-(4) (2020) ..........................................................................9

Fed. R. Civ. P. 23.1...........................................................................................6, 8

Fed. R. Civ. P. 12(b)(6)..........................................................................................6

Lead Plaintiff's Opposition to Block Inc. and the Individual Defs.' Motion to
Dismiss Pursuant to FRCP 23.1 and 12(b)(6)
Case No. 5:25-cv-01262-NW                                                                     vi

**INTRODUCTION**

Directors and officers of a Delaware corporation owe fiduciary duties that require them to, among other things, (i) ensure that the corporation complies with its legal obligations and addresses corporate misconduct, and (ii) refrain from enriching themselves at the expense of the corporation.

As alleged in Lead Plaintiff James Kelly's ("Plaintiff") Verified Shareholder Derivative Complaint (the "Complaint"),[1] the Individual Defendants[2] failed to meet these obligations, resulting in an outbreak of fraud and other financial crimes on Block's Cash App service ("Cash App"). The Individual Defendants intentionally failed to implement adequate internal controls to detect and prevent illegal conduct on Cash App in order to pursue a business plan premised on achieving growth without regard for regulatory compliance. As internal Company books and records obtained by Plaintiff demonstrate, the Individual Defendants sought to unlawfully expand Block's customer base by failing to adequately verify its customers' identities, ignoring suspicious activity and under-reporting such activity to regulators in violation of positive law, and further underfunding Cash App's compliance efforts, causing Cash App to become the payment application of choice for fraudsters, money launderers, and other criminals. Dorsey and McKelvey further violated their duty of loyalty by selling hundreds of millions of dollars of their Block shares while knowing that Block's compliance program was deficient. The Individual Defendants' wrongdoing escalated to fraud, as they misled shareholders regarding Block's investment in regulatory compliance and its success in attracting users. The Individual Defendants' failure to implement an adequate compliance program while fabricating the Company's adherence to regulatory requirements exposed Block to hundreds of millions of dollars in actual and potential liability.

Demand on the Board is excused here for at least two reasons.

---

[1] *See* ECF No. 63-2; *see also Kelly v. Dorsey et al.*, No. 4:25-cv-03615-KAW (N.D. Cal. Apr. 24, 2025), ECF No. 3-2.

[2] Capitalized terms not defined herein shall have the same meaning as in the Complaint.

*First,* a majority of the of the directors on the Company's Board at the time the Complaint was filed (the "Demand Board") faces a substantial likelihood of liability for breaching its oversight obligations in violation of the duty of loyalty. Throughout the Relevant Period, the Board was repeatedly presented with evidence that Block was failing to comply with its regulatory obligations, including being informed of "████████████" for virtually every aspect of Cash App, and that the strategy of ███████████████████████████ to address these failures was not working. Instead of addressing these problems, the Board approved plans ████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██ The Demand Board ignored these problems, instead ████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████

Likewise, Defendants Dorsey and McKelvey face liability for trading Block shares on nonpublic information about the Company's choice to prioritize growth over compliance.

*Second*, demand is excused because a majority of the Demand Board lacks independence from Dorsey and McKelvey and cannot rationally consider a litigation demand to sue them.

The Complaint also states claims for violations of Sections 10(b), 14(a) and 29(b) of the Securities Exchange Act of 1934 ("Exchange Act"). The Individual Defendants knowingly misled Block and its shareholders by overstating Block's commitment to regulatory compliance, which harmed the Company itself when it repurchased millions of its shares.

## FACTUAL BACKGROUND[3]

### I.    Company Background

Block is a financial services and digital payment company.  Block is subject to record-keeping and bank reporting requirements aimed to prevent money laundering and fraud.  ¶¶52–54.[4]  Block ███████████████████████████████████████████████. ¶8.

### II.    Block's Regulatory Compliance Violations

The Board and its Audit and Risk Committee ("ARC") routinely ignored the Company's compliance problems, which snowballed throughout the Relevant Period.  As early as 2019 (and into 2022), ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ ¶¶96, 101, 102, 115, 117, 120, 131.  By October 2019, ████████

████████████████████████████████████████████████████████

████████ ¶101.

████████████████████ ¶150.

████████████████████████████████████████████████████████

████████████████████████████████████ ¶87. ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ ¶102. ████████

████████████████████████████████████████████████████████

████████████████ ¶88.

---

[3] Lead Plaintiff incorporates by reference his Opposition to Block, Inc.'s Motion to Dismiss on *Forum Non Conveniens* Grounds ("Forum Motion") filed concurrently herewith, including its factual recitation.

[4] References to "¶" are to paragraphs of the Complaint.

The Director Defendants also knew that ███████████████████████████
███████████████████████████████████. Throughout the Relevant Period, the
Individual Defendants were informed that ████████████████████████████████
█████████████████████████████████████████████████████████████████████
███████████████████████ ¶96.  The Board sat idly by while Block ████████████
█████████████████████████████████████████████████████████████████████
████████████████████ ¶¶97-99, 116, 121.

Worse, Defendants intentionally prioritized growth at the expense of compliance.  For
example, █████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
████████████████████ ¶¶102–03.  In October 2019, the Board was also informed that ████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
¶107.  But the Board did not question ███████████████████████████████████████
████████████████████████ ¶¶107-08.  And when Block failed ██████████████████████
█████████████████████████████████████████████████████████████████████
██████ ¶¶117, 119.

In early 2020, Block also ███████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
█████████████████████ ¶111.  In effect, Block allowed █████████████████████████
█████████████████████████████████████████████████████████████████████
██████████████████████████████ *Id*. █████████████████████████████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████ ¶¶113, 140,
144.

Lead Plaintiff's Opposition to Block Inc. and the Individual Defs.' Motion to
Dismiss Pursuant to FRCP 23.1 and 12(b)(6)
Case No. 5:25-cv-01262-NW                                                    4

After the Board learned in late 2020 ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████ ¶¶131, 134, 159.  Block failed to disclose

these weaknesses in its proxies and public filings.  ¶¶73–81, 248–251.

On January 15, 2025, the Conference of State Bank Supervisors announced that Block had agreed to pay an $80 million fine to settle claims with forty-eight U.S. state financial regulators for violations of BSA/AML laws.  ¶225.  Pursuant to the settlement agreement, Block agreed to establish a compliance management committee and hire an independent consultant to review the efficacy of its BSA/AML program.  ¶227.

A day later, on January 16, 2025, the Consumer Financial Protection Bureau issued a consent order against Block finding, *inter alia*, that (i) Block failed to take timely, appropriate, and effective measures to prevent, detect, limit, and address fraud on its Cash App platform; (ii) Block's customer service systems for Cash App were unfair and in violation of the Consumer Financial Protection Act of 2010; and (iii) Block failed to comply with the requirements of the Electronic Funds Transfer Act and Regulation E.  ¶220.  Block was required to fully investigate unauthorized transactions on its platform and pay $175 million in restitution and fines.  ¶221.  On April 10, 2025, Block was forced to settle with the New York Department of Financial Services ("NYDFS") for $40 million after the NYDFS investigation revealed "critical gaps in Block's … BSA/AML program."  ¶228.

### III.    Harms to the Company

The Company (and its shareholders) were harmed by Defendants' serial noncompliance with their regulatory obligations.  This action was filed to remedy harms incurred by the Company (as opposed to shareholders).  The Company *(i.e.,* Block itself) has paid a combined $295 million in fines and settlements to financial regulators for its noncompliance with BSA/AML laws.  ¶¶220–228.  Block also faces possible further legal action by state Attorneys General, ¶231, and a private securities class action lawsuit.  ¶234.  The harms were magnified because Defendants also caused Block to repurchase over $500 million in shares of Block common stock from November 2023 to

April 2024, during a time when the Company's stock price was artificially inflated by Defendants' misrepresentations about Block's customer base growth and anti-fraud measures. ¶¶336, 340. This and other misrepresentations in the Company's public filings harmed shareholders. ¶¶71-82, 193, 327–330.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face[.]" *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018) (internal quotation marks omitted). When "[e]valuating a motion to dismiss, the Court 'must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party.'" *Kang v. PayPal Holdings, Inc.*, 620 F. Supp. 3d 884, 895 (N.D. Cal. 2022) (citation omitted).

"A shareholder seeking to vindicate the interests of a corporation through a derivative suit must first demand action from the corporation's directors or plead with particularity the reasons why such demand would have been futile." *Rosenbloom v. Pyott*, 765 F.3d 1137, 1148 (9th Cir. 2014) (citation omitted). "A court looks to the law of the state of incorporation to determine when demand would be futile." *Arduini v. Hart*, 774 F.3d 622, 628 (9th Cir. 2014).

Block is incorporated in Delaware. *See* Block, Inc.'s and the Individual Defs.' Notice of Mot. and Mot. to Dismiss Pls'. Consolidated Shareholder Deriviatve Compl. Pursuant to Fed. R. Civ. P. 23.1 and 12(b)(6), ("MTD" or the "Motion"), ECF No. 55 at 6. Under Delaware law, demand on a board is excused where a plaintiff alleges particularized facts creating "a reasonable doubt" that a majority of the demand board were disinterested and independent. *United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1048 (Del. 2021). The Court must consider whether each director: (i) "received a material personal benefit from the alleged misconduct that is the subject of the litigation demand"; (ii) "faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand"; or (iii) "lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who

would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand." *Id.* at 1059. "If the answer to any of the questions is 'yes' for at least half of the members of the demand board, then demand is excused as futile." *Id.*

In determining whether demand is futile, the Court "does not weigh the evidence, must accept as true all of the complaint's particularized and well-pleaded allegations, and must draw all reasonable inferences in the plaintiff's favor." *Id.* at 1048. Courts will consider whether, "taken together" in "full context," the totality of the allegations gives the Court reason to doubt that a particular director is disinterested or independent. *Del. Cnty. Emps. Ret. Fund. v. Sanchez*, 124 A.3d 1017, 1022 & n.20 (Del. 2015).

The Demand Board comprises Dorsey, McKelvey, Botha, Brooks, Carter, Deighton, Eisen, Garutti, Meeker, and Narula. ¶267. Demand is excused because no less than eight members of the Demand Board (*i.e.,* Dorsey, McKelvey, Botha, Brooks, Carter, Deighton, Garutti, and Meeker) face a substantial likelihood of liability.

## ARGUMENT

### I.    Demand is Excused Because a Majority of the Demand Board Faces a Substantial Likelihood of Liability.

To establish a substantial likelihood of liability at the pleading stage, a plaintiff "does not have to demonstrate a reasonable probability of success on the claim." *La. Mun. Police Emps.' Ret. Sys. v. Pyott*, 46 A.3d 313, 351 (Del. Ch. 2012), *rev'd on other grounds*, 74 A.3d 612 (Del. 2013). Plaintiffs must make "a threshold showing, through the allegation of particularized facts, that their claims have some merit." *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993).

#### A.    A Majority of the Demand Board Faces a Substantial Likelihood of Liability Under *Caremark*.

Here, eight members of the Demand Board—Defendants Dorsey, McKelvey, Botha, Brooks, Carter, Deighton, Garutti, and Meeker—face a substantial likelihood of liability for breach

of the duty of oversight.[5]  Plaintiff's *Caremark* claim sounds in the duty of loyalty, which is not subject to exculpation.  *See In re Cornerstone Therapeutics Inc., S'holder Litig.*, 115 A.3d 1173, 1179-80 (Del. 2015); *see also Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).  To plead a *Caremark* claim, a plaintiff must allege particularized facts to support a reasonable inference that "(a) the directors utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."  *Id*.

Plaintiff brings claims under *Caremark*'s second prong.  Under Rule 23.1, "[t]o state a prong two *Caremark* claim, Plaintiff must plead particularized facts that the board knew of evidence of corporate misconduct—the proverbial red flag—yet acted in bad faith by consciously disregarding its duty to address that misconduct."  *In re Boeing Co. Derivative Litig.*, 2021 WL 4059934, at *33 (Del. Ch. Sept. 7, 2021) (citation omitted).  Critically, "[w]hen faced with knowledge that the company controls are inadequate, the directors must *act,* i.e., they must prevent further wrongdoing from occurring."  *Rich ex rel. Fuqi Int'l, Inc. v. Chong*, 66 A.3d 963, 984 (Del. Ch. 2013).  That "*some* efforts had been implemented is insufficient": a Board's oversight in response to red flags must "target[] the mission critical compliance risk that undergirds the Complaint."  *Teamsters Local 443 Health Svcs. & Ins. Plan v. Chou*, 2020 WL 5028065, at *20 (Del. Ch. Aug. 24, 2020).

Here, the Current and Former Director Defendants—including eight Demand Board members—consciously ignored red flags showing that Block's compliance and risk management systems were inadequate in the face of the rampant criminal activity that was flourishing on Cash App.  Worse, the Board consciously directed the Company to sacrifice its compliance obligations to boost user growth and reduce costs.  During the Relevant Period, the Company (with the Board's knowledge and acquiescence) deliberately deactivated or hobbled compliance measures to lower

---

[5] Each of these members of the Demand Board served on the Board for the entire Relevant Period except for Brooks, whose service began in October 2019, ¶25, and Carter, whose service began in May 2021, ¶26.

costs and grow user activity on the platform, including (but not limited to):  (a) ████████
████████████████████████████████████████████████████████, [6] ¶¶97, 116, 121;
(b) ████████████████████████," ¶107; (c) ████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████ ¶111;
(d) ██████████████████████████████████████████████ ¶119; (e)
████████████████████████████ ¶124;  and  (f) ██████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████ ¶¶124-25.  In
short, the Board knew and approved of Block's ██████████████████████████
████████████████████████████ disregarding  requisite  BSA/AML  customer
identification programs, fraud and other crime prevention, and other compliance obligations in the
process.  ¶¶89-91.

      The full Board was further advised that the Company was failing to carry out its compliance
obligations, including that: (i) ██████████████████████████████████████
████████████████ ¶¶123, 165; (ii) ████████████████████████████
████████████████████████████████████████████████████████
████████████████████████ ¶102; (iii) ██████████████████████████
████████████████████████ ¶125; (iv) ██████████████████████████
████████████████████████████████████████████████████████
████████████████████████ 134; and (v) ██████████████████████
████████████████████████████████████████████████████████

---

[6] Defendants ask the Court to infer that Block's ██████████████ were legal, which is impermissible
at the pleadings stage.  *See* MTD at 15; *contra PayPal*, 620 F. Supp. 3d at 895.  SARs are required
by the FDIC to include an examination of individual transactions, including the identification of
individual potential suspects, individual transactions involving potential money laundering or
violations of the Bank Secrecy Act, and individual transactions involving funds derived from
illegal activities.  *See* 12 C.F.R. § 353.3(a)(2)-(4) (2020).  It is reasonable to infer that Block's ████
████████████████████ is inconsistent with the Company's legal requirement
to know its customers, identify illegal activity, and prepare SARs.

¶¶150-51.  ARC members Botha and Deighton[7] were also informed that: (i) ███████████

████████████████████████████████████████████████████████████████

███████████████████ ¶¶87-88, 115-16; (ii) ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

¶106;  (iii) ███████████████████████████████████████████████████████

████████████████████████████████████████████████ ¶96; (iv) ███████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████ ¶¶141-42; (v) ███████████████████████████████ as of

July 2022, ¶153; and (vi) as of February 2023—two years after the Board learned of ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████ ¶¶156-57.

        The Board and ARC knew the Company's ████████████████ were woefully

inadequate to address these myriad problems, but failed to implement adequate measures to ensure

compliance with Block's legal obligations.  From April 2019 through July 2020, the ARC was

informed that ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████ ¶¶96, 99, 104, 116, 121.  In July 2019, the Board learned that █████████████

████████████████████████████████████████████████████ ¶163.

Yet the Board took no action as the Company ████████████████████  In response

to ██████████████████████████████████ in February 2021, the Board learned

that Block would continue to ████████████████████████" ¶134.  And in February

2023, the ARC was alerted to ████████████████████████████████████████

--------

[7] Botha served on the ARC throughout the Relevant Period.  ¶24.  Deighton served on the ARC beginning in June 2022.  ¶27.

███████████████████████████████████████████████████████

██████████████████████████ ¶¶156-59.

The Board also allowed Block management, ███████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████ ¶¶176, 178, 181, 185.

The documents cited by Defendants fail to show that █████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████ *See id.*; *see also*

¶¶185-86.

These facts paint a clear picture: the Board knew that the Company was intentionally undermining its own compliance efforts to facilitate reportable growth; knew of significant, ███████████████ problems with Block's compliance program that went unremediated; and knew that the paltry compliance staffing, machine learning solutions, and outsourcing the Company had implemented were failing to adequately address those problems.

That the Board "received reports regarding Block's compliance program," does not absolve Defendants of liability and, instead, demonstrates that the Board was well aware of the problems at the Company. *See* MTD at 9-10. Being made aware of red flags is not adequate; the Company must actually "target[] the mission critical compliance risk." *Chou*, 2020 WL 5028065, at *20. The Court of Chancery's ruling in *Lebanon County Employees' Retirement Fund v. Collis* is instructive on this point. *See* 2022 WL 17841215 (Del. Ch. Dec. 22, 2022, *rev'd on other grounds*, 311 A.3d 773 (Del. 2023). That case concerned a "Prong 2" *Caremark* claim against a pharmaceutical company that contributed to the nationwide opioid crisis. *See id.* at *1. The company had implemented a revised order monitoring program in 2015, and plaintiffs alleged that afterwards, the board failed to oversee the company's compliance program. *See id.* at *16. The director defendants argued that they were not consciously disregarding red flags because they reviewed reports of the company's compliance systems. *See id.* The court disagreed because "the content of the reports detailed the paltry number of suspicious orders that the Company was

identifying, yet the defendants did nothing in response." *Id.*  Instead, the court held that "the directors knew that the Company's existing systems were inadequate and consciously decided not to take any action in response to the red flags." *Id.*

Here, similarly, the periodic reports that the Board and ARC received showed over a period of years that Block was continually failing to keep pace with its regulatory obligations.  Yet, the Board did not act to address those failures.  Among other failings: (i) the Board ███████ █████████████████████████████████████████████████████████████████████ ████████████████████████ ¶98; (ii) in October 2019, the Board ████████████████████ ████████████████████████████████ ¶¶107-08; (iii) in February 2020, the ARC ████████ ███████████████████████████████████ ¶112; (iv) in October 2020, the Board ███████ ████████████████████████████████████████████████████████ ¶¶131-32; (v) in February 2022, the Board ████████████████████████████████████████████████████████ ████████████████████████████████████████ ¶151; (vi) February 2023 ARC pre-read materials revealed ██████████████████████████████████████████ ██████████████████████████████████████████████ ███████████ ¶¶159, 174.

The cases Defendants rely upon are inapposite.  *See* MTD at 9-10.  For example, in *Pettry ex rel. FedEx Corporation v. Smith*, once FedEx Corp.'s board learned that its carriers delivered illegal cigarettes, the company, overseen by its board, (i) formed a demand committee to consider whether to bring a derivative claim against certain directors; (ii) reprimanded employees involved in wrongdoing; (iii) banned most tobacco shipments; and (iv) introduced training programs to increase the detection of illegal cigarette shipments.  *See* 2021 WL 2644475, at *8-9 (Del. Ch. June 28, 2021).  And in *Clem v. Skinner*, when the board of Walgreens Boots Alliance, Inc. learned that the company's retail pharmacy software was set to overdispense insulin pens, it remediated the problem by reprogramming the software to dispense the appropriate number of insulin pens for each patient.  *See* 2024 WL 668523, at *11 (Del. Ch. Feb. 19, 2024).

Here, in contrast, the Board learned of ███████ red flags, knew that the Company was implementing a woefully deficient response to such ███████ issues, failed to address those deficiencies, and learned that the Company was ███████████████████████ ███████████████████ Defendants acted in bad faith under *Caremark. See, e.g.*, *Chou*, 2020 WL 5028065, at *17.

Defendants improperly rely on heavily-redacted documents produced in response to Plaintiff's Section 220 demand to seek improper Defendant-friendly inferences. The "incorporation-by-reference doctrine does not enable a court to weigh evidence on a motion to dismiss" or "change the pleading standard that governs a motion to dismiss." *Ontario Provincial Council of Carpenters' Pension Tr. Fund v. Walton*, 2023 WL 3093500, at *3 (Del. Ch. Apr. 26, 2023) ("At this stage of the case, the plaintiffs receive the benefit of their reasonable interpretations and inferences"); *see also In re Clovis Oncology, Inc. Derivative Litig.*, 2019 WL 4850188, at *15 n.216 (Del. Ch. Oct. 1, 2019) ("Section 220 documents, hand selected by the company, cannot be offered to rewrite an otherwise well-pled complaint."); *Khoja*, 899 F.3d at 1014 ("The incorporation-by-reference doctrine does not override the fundamental rule that courts must interpret the allegations and factual disputes in favor of the plaintiff at the pleading stage"). Section 220 documents produced as exhibits to a motion to dismiss are of particularly limited value when they are heavily redacted for relevance. *See Walton*, 2023 WL 3093500, at *3 ("the redactions deprive the court of insight into the context, the substance of the discussion, and any decision that might have been made"); *In re McDonald's Corp. S'holder Derivative Litig.*, 291 A.3d 652, 696 (Del. Ch. 2023) ("Here, the Company engaged in questionable redaction practices, such as recurrent partial-sentence redactions. . . . A document should not look like the author of a ransom note scoured it to make a missive.").

These documents do not rebut the well-pled allegations in the Complaint that the Board ignored red flags. Defendants mistakenly invite the Court to ignore the totality of Plaintiff's allegations and instead focus solely on a handful of Company records largely taken out of context. MTD at 12-16; *contra United Food & Com. Workers Union v. Zuckerberg*, 250 A.3d 862, 877

(Del. Ch. 2020) (explaining that the court must consider "the plaintiff's allegations in their totality" when determining demand futility) (internal citation omitted).

**SARs and Backlogs**.  The heavily redacted excerpts that Defendants attach reveal that the Board ignored signs that the Company's compliance measures were inadequate.  Exhibits N, Q, and R are excerpts from ARC pre-read materials in 2019 and 2020 that ████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████  *See* Ex. N at 6-7 ███████████████ ████████████████████████████  ; *id.* at 6 ████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████  Ex. Q at 14 █████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████  Ex. R at 12 ████████████████████████  *id.* at 10 ██████████████████████ █████████████████████████████  These documents do not show that the Board acted in good faith to respond to these failures.

**Criminal Activity on Cash App**.  Defendants ask the Court to ignore Defendants' yearslong compliance failures, citing documents purporting to show that Block implemented measures to address criminal activity on Cash App.  MTD at 14.  But these Board materials refer, at best, to ███████████████████████████████████████████████████████████ ███████████████████  *See* Ex. R at 7 ██████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████  ; Ex. H at 5 ███████████████████████ ████████████████████████████████████████████████████████████ ██████████████████  ; Ex. X at 14 ████████████████████████ ██████████████████  ; Ex. I at 5 ███████████████████████████

1 ██████████████████████████████████████████████████████████

2 ████████

3 ████████████████████.  Block's ████████████████ during a period of increased

4 suspicious activity on Cash App was a clear red flag.  Defendants improperly ask the Court to

5 credit their inference over that of the well-pled complaint, relying on Exhibit N to argue that Block

6 ██████████████████████████████████████████████████████████

7 ████████ MTD at 15.  But Exhibit N shows that the Company would ████████████

8 ██████████████████████████████████████████████████████████

9 ████████  Ex. N at 5.  The Court must resolve all inferences in Plaintiff's favor on a motion to

10 dismiss.  *Zuckerberg*, 262 A.3d at 1048.  And in any event, even if concerns about false positives

11 factored into the Company's decision, the Board made no effort to institute a process to address

12 the increased suspicious activity on Cash App.  *See supra* at 11-12.

13       **Staffing**.  Defendants rely on other documents to argue that the Company addressed its

14 staffing shortages.  *See* MTD at 15 (citing Defs.' Exs. L, R, Q).  But these documents do not show

15 that the Board *adequately* addressed Block's staffing needs.  For example, Exhibit Q focuses on

16 ██████████████████████████████████████████████ which the

17 Board failed to oversee, but adds that Cash App's compliance team would only ████████████

18 ████████████████████████ Defs.' Ex. Q at 14.  Later, the same document states

19 that ██████████████████████████████████████████████████

20 and that ████████████████████████████ *Id.* at 19.  Block's inadequate

21 outsourcing strategy and a few in-house hires fail to address Block's ████████████ widespread

22 compliance failures.

23         **B.**    **Dorsey and McKelvey Face a Substantial Likelihood of Liability Under**

24              ***Brophy.***

25       Demand Board members Dorsey and McKelvey are also incapable of considering a

26 Demand because they face a substantial likelihood of liability under *Brophy*.  *See Brophy v. Cities*

27 *Serv. Co.*, 70 A.2d 5 (Del. Ch. 1949).  "Under Delaware law, directors who misuse company

28 information to profit at the expense of innocent buyers of their stock should disgorge their profits."

*In re Am. Int'l Grp., Inc.* 965 A.2d 763, 800 (Del. Ch. 2009) (internal quotation marks omitted). To plead a *Brophy* claim, Plaintiffs must show that "1) the corporate fiduciary possessed material, nonpublic company information [("MNPI")]; and 2) the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information." *In re Oracle Corp.*, 867 A.2d 904, 934 (Del. Ch. 2004). At the pleading stage, Plaintiffs may plead "circumstantial facts," and "a successful claim typically includes allegations of unusually large, suspiciously timed trades that allow a reasonable inference of scienter." *Grabski ex rel. Coinbase Global, Inc. v. Andreessen*, 2024 WL 390890, at *9 (Del. Ch. Feb. 1, 2024).

Dorsey and McKelvey possessed MNPI when they sold Block shares. ¶244. As Board members, Dorsey and McKelvey learned about severe compliance deficiencies described in internal Company records. *See supra* at I.A. None of this information was publicly disclosed. For that reason, Defendants' reliance on *In re Camping World Holdings*—where the complaint did not identify specific MNPI that fiduciaries possessed when they made their trades—is misplaced. 2022 WL 288152, at *11 (Del. Ch. Jan. 31, 2022).

There is also a substantial likelihood that Dorsey and McKelvey acted with scienter. In evaluating scienter at the pleading stage, Delaware courts looks to several factors, including (1) "the timing of the trade, including the proximity between the trade and the time the defendants learn of MNPI, and the expiration date for any options or restrictions (like lock-ups)"; (2) "the size of the trade relative to the defendant's overall stock holdings"; and (3) "the size of the trades and the type of compensation (cash or shares)." *Grabski*, 2024 WL 390890, at *10. Here, the size of the trades and their timing support the inference that Dorsey and McKelvey traded their Block shares motivated at least in part by their possession of MNPI. Throughout 2020 and 2021, Dorsey and McKelvey each sold more than *$550 million* of their Block shares while knowing that the

Company's public filings did not accurately reflect the Company's compliance function.[8]  ¶¶246-47; ¶¶73-74, 193.

In arguing against scienter, Defendants rely almost entirely on Dorsey and McKelvey's Rule 10b5-1 trading plans.  *See* MTD at 17-18.  While a Rule 10b5-1 plan "*may* rebut an inference of scienter," *Lamartina v. VMware, Inc.*, 2021 WL 4133851, at *12 (N.D. Cal. Sept. 10, 2021) (internal citations and punctuation omitted), the mere reference to a Rule 10b5-1 plan is not an affirmative defense to insider trading, *see Azar v. Yelp, Inc.*, 2018 WL 6182756, at *18-19 (N.D. Cal. Nov. 27, 2018) ("all that can be gleaned from the Forms 4 is that Stoppelman's '[s]hares were sold pursuant to a duly adopted 10b5-1 trading plan.'").  Defendants also claim that the size of the challenged trades—100,000 shares per week for Dorsey and 200,000 shares per week for McKelvey—were consistent with their prior 10b5-1 plans.  But the challenged trades deviated from Dorsey and McKelvey's previous trading patterns.  Because Block's share price tripled in value between 2018 and late 2020, Dorsey and McKelvey's challenged trades represented a large increase in the magnitude of their trades.  *Compare* MTD Ex. AA, BB *with* Ex. CC, DD.

## II.    Demand is Excused Because a Majority of the Demand Board Lacks Independence from Dorsey and McKelvey.

Delaware law does not entrust a director with considering a litigation demand "if another person was interested in the alleged wrongdoing, and the director lacks independence from that person."  *In re BGC P'rs, Inc. Derivative Litig.*, 2021 WL 4271788, at *6 (Del. Ch. Sept. 20, 2021) (citation omitted).  On a motion to dismiss, a plaintiff can plead non-independence by alleging facts from which the director's ability to act impartially toward an interested party "can be doubted because that director may feel either subject to the interested party's dominion or beholden to that interested party."  *Sanchez*, 124 A.3d at 1023 n.25.  A plaintiff satisfies this test if it alleges that a director's relationship with an interested party "might have a material effect on the parties' ability

---

[8] While Defendants point to the portion of shares that McKelvey and Dorsey sold relative to their total holdings, that factor "is not the litmus test that the [] Defendants describe" where, as here, the "totality of the circumstances . . . support a pleadings-stage inference of scienter."  *Grabski*, 2024 WL 390890, at *11 & n.81 (citing *In re Clovis*, 2019 WL 4850188, at *15).

to act adversely toward each other." *Sandys v. Pincus*, 152 A.3d 124, 134 (Del. 2016). Delaware law "requires that all the pled facts regarding a director's relationship to the interested party be considered in full context in making the, admittedly imprecise, pleading stage determination of independence." *Sanchez*, 124 A.3d at 1022.

Dorsey and McKelvey are interested the wrongdoing alleged in the Complaint because they face a substantial likelihood of liability under *Brophy*; they cannot consider a demand involving their own conduct. *See supra* at I.B; *see also McElrath v. Kalanick*, 224 A.3d 982, 991 (Del. 2020). Defendants concede that Carter's extensive business and personal ties to Dorsey preclude a finding of independence. *See* ¶¶297-309; MTD at 18-21. As described in the Complaint, Demand Board members Dorsey, McKelvey, Botha, Meeker, and Eisen also lack independence from Dorsey and/or McKelvey. ¶¶283-322.

### A.    Dorsey and McKelvey

An "important personal and business relationship . . . supports a pleading-stage inference that [a director] cannot act independently." *Marchand v. Barnhill*, 212 A.3d 805, 820 (Del. 2019). Delaware law does not "ignore the social nature of humans or that they are motivated by things other than money, such as love, friendship, and collegiality." *Id.* at 818 (internal quotation marks omitted).

The Complaint pleads several facts showing that Dorsey and McKelvey have a close business and personal relationship such that they could not independently consider a litigation demand. First, Dorsey and McKelvey met more than three decades ago, when a fifteen-year-old Dorsey interned at McKelvey's company, Mira. ¶¶284, 289. Second, McKelvey has confirmed his and Dorsey's close personal relationship, describing the pair as "friends and colleagues ever since" Dorsey's internship. *Id.* Third, as further evidence of their decades-long close relationship, Dorsey and McKelvey co-founded Block together, and their shares in the Company now form a majority of their net worths. ¶¶284-85, 289.

Defendants attack each of these markers of beholdenness *seriatim*, citing cases standing for the proposition that each factor, standing alone, is insufficient to create a reasonable inference

of non-independence. *See* MTD at 19. But under Delaware law, "all the pled facts" must be considered "in full context." *Sanchez*, 124 A.3d at 1022-23 (finding that a director who was "close friends" with the chairman for "a half century" and was also "an executive at a subsidiary of a corporation over which [the chairman] has substantial influence" was not independent). In *Sanchez*, the Delaware Supreme Court criticized the trial court's finding of independence because, like Defendants, it "seemed to consider the facts the plaintiffs pled about [the director's] personal friendship with [the chairman] and the facts they pled regarding his business relationships as entirely separate issues." *Id.* at 1021. As in *Sanchez*, the combination of McKelvey and Dorsey's admitted personal friendship with their intertwined business interests demonstrates that they could not exercise independent judgment concerning a litigation demand. The Company concedes that Dorsey and McKelvey are not independent under the New York Stock Exchange listing standards, whose "focus on whether directors can act independently of the company or its managers has important relevance to whether they are independent for purposes of Delaware law." *Sandys*, 152 A.3d at 133; ¶¶283, 288. Thus, there is reasonable doubt whether Dorsey and McKelvey can independently consider a demand.

## B.    Meeker

Meeker is not independent of Dorsey or McKelvey because she serves as a General Partner of Kleiner Perkins, a venture capital firm that led a $100 million financing round for Block in 2011 that resulted in Meeker's appointment to the Board. ¶311. Under highly analogous circumstances, the Delaware Supreme Court in *Sandys v. Pincus* held that two other directors were interested by virtue of being partners at Kleiner Perkins, which owned 9.2% of the company in that case's equity. *See Sandys*, 152 A.3d at 133-34 ("the reality is that firms like Kleiner Perkins compete with others to finance talented entrepreneurs like Pincus, and networks arise of repeat players who cut each other into beneficial roles in various situations."). Because of that reality, "it is reasonable to expect that sort of relationship might have a material effect on the parties' ability to act adversely toward each other." *Id.*

### C.     Botha

Botha owes his Board seat to his venture capital firm, Sequoia Capital, also serving as one of Block's early investors.  Accordingly, he cannot independently consider a demand for the same reasons as Meeker.  Further, Botha and Sequioa Capital later invested in Elon Musk's bid to acquire Twitter, Inc., another of Dorsey's companies, and Dorsey rolled over $1 billion of Twitter shares in the Musk-Twitter transaction.  ¶294. Botha had previously worked for Musk at one of Musk's companies, PayPal Holdings, Inc.  ¶295.  Because Botha and Dorsey were part of a web of Silicon Valley financiers who repeatedly invested in each other, *see Sandys*, 152 A.3d at 134, there is a reasonable doubt that Botha could disinterestedly consider a litigation demand.

### D.     Eisen

Eisen could not exercise independent judgment over whether to sue Dorsey and McKelvey because he owes them (alongside Botha, Brooks, Carter, Deighton, Garutti, and Meeker) a material portion of his wealth.  Block, with the necessary affirmative votes of Dorsey and McKelvey, acquired Eisen's company, Afterpay, in 2021.  ¶315.  Eisen owed his wealth (which reached $1.16 billion in June 2023 following the Afterpay acquisition) in large part to his transaction with Block, which depended on Dorsey and McKelvey's (alongside the Board's) approval.  There is reasonable doubt as to a director's independence where the director "owes an important debt of gratitude" to an interested individual.  *Marchand*, 212 A.3d at 820.  "Directors who owe their success to another" are particularly subject to disabling feelings of beholdenness.  *In re Match Grp., Inc. Derivative Litig.*, 315 A.3d 446, 472 (Del. 2024).

Defendants cite federal authorities to portray Block's Afterpay acquisition as nothing more than a business transaction.  *See* MTD at 21.  These cases ignore Delaware authorities holding that business relationships can engender feelings of beholdenness.  *See, e.g.*, *In re Oracle Corp. Derivative Litig.*, 824 A.2d 917, 938 (Del. Ch. 2003); *see also In re Fox Corp. Derivative Litig.*, 2024 WL 5233229, at *17 (Del. Ch. Dec. 27, 2024); *Marchand*, 212 A.3d at 818.

III.    **The Complaint States Claims Under Rule 12(b)(6).**

      A.    **The Complaint States Claims Under *Caremark* and *Brophy*.**

Because the Complaint establishes *Caremark* and *Brophy* violations under the heightened demand futility standard, *supra* at I.A-B, it necessarily satisfies the less onerous standard under Rule 12(b)(6).  *See In re Amtel Corp. Derivative Litig.*, 2008 WL 2561957, at *9 (N.D. Cal. June 25, 2008).

      B.    **The Complaint States Claims Under the Exchange Act.**

        1.    **The Complaint States a Section 10(b) Claim.**

To state a claim under Section 10(b) of the Exchange Act, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 704 (9th Cir. 2016).

Here, Defendants misled shareholders by reassuring them regarding the adequacy of Block's compliance program throughout the Relevant Period.  ¶¶71-82.  Each Defendant signed SEC filings that made false statements of fact regarding Block's compliance program, including that "[w]e have implemented an AML program designed to prevent our payments network from being used to facilitate money laundering, terrorist financing, and other illicit activity."  ¶¶73, 76, 79, 81.  As set forth above, Defendants knew that Block was failing to comply with AML requirements, resorting to ███████████████████████████████████████ ███████████████████  ¶¶93-96, 99, 107, *supra* at I.A.  Defendants knew that their repeated statements that the Company had "a compliance program focused on the laws, rules, and regulations applicable to [its] business," and that Block "vet[s] and monitor[s] [its] customers and the payments transactions [it] process[es] for them as part of [the Company's] risk management efforts" were factually inaccurate.  ¶74, 77, 80.  Dorsey's February 24, 2022 claim that Block had "limits in place" to manage fraud on Cash App was also knowingly misleading, ¶78, because Dorsey had received repeated warnings that ███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ ¶¶122-24, 130-32.

Similarly, Defendants knew that their quarterly Shareholder Letters contained factually misleading statements regarding the total number of "transacting active users" on Cash App, which failed to account for multiple accounts associated with a single active user to artificially inflate Cash App's engagement and activity on the platform. ¶¶192-93. By reporting the number of accounts, as opposed to the number of unique users, the Company purposefully inflated its user metrics and artificially lowered the reported costs Block paid to acquire new users on a per user basis. ¶¶149, 191. The Company relied on Defendants' misstatements in repurchasing more than $1.5 billion of its common stock. ¶¶335-36.

Defendants fail to engage with these facts, instead pointing to cases holding that a company cannot rely on the false statements of its own directors for purposes of a derivative Section 10(b) claim. *See* MTD at 23 (citing *In re Verisign, Inc. Derivative Litig.*, 531 F. Supp. 2d 1173, 1209 (N.D. Cal. 2007)). That argument has been repeatedly rejected by subsequent courts. *See Shaev v. Baker*, 2017 WL 1735573, at *17-18 (N.D. Cal. May 4, 2017) (collecting cases and rejecting *Verisign* as overly restrictive) (citation omitted); *In re Finisar Corp. Derivative Litig.*, 2012 WL 2873844, at *17 (N.D. Cal. July 2012) (same); *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1073 (C.D. Cal. 2008) (same). Defendants' contention that a derivative Section 10(b) claim is not cognizable is wrong as a matter of law.

Finally, Defendants' halfhearted arguments against Plaintiff's scienter and falsity allegations fail. Defendants mischaracterize their misleading statements regarding Block's compliance program as "general" or "aspirational." MTD at 23. But statements that Block, for example, "vet[s] and monitor[s] [its] customers and the payments transactions [it] process[es] for them" or has "implemented an AML program designed to prevent our payments network from being used to facilitate money laundering, terrorist financing, and other illicit activity" are specific and disprovable statements of fact. *Supra* at I.A. At a minimum, these statements concealed known risks related to Block's compliance program, a category of omission that courts have

repeatedly found actionable.  *See Schueneman*, 840 F.3d at 708; *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008).  As to scienter, the "most direct way" to allege scienter is with "contemporaneous reports or data, available to the party, which contradict the statement." *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1230-31 (9th Cir. 2004). That is precisely the case here.  For example, far from "vetting" or "monitoring" its customers, Defendants received reports that Block was ████████████████████████████████████ ████████████████████████ ¶¶99, 104, 124.  Because Defendants knew that their statements were false or incomplete when made, Plaintiff states a Section 10(b) claim.

## 2.    The Complaint States a Section 14(a) Claim.

To establish a Section 14(a) claim, Plaintiff must allege that "(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *N.Y. City Emps.' Ret. Sys. v. Jobs*, 593 F.3d 1018, 1022 (9th Cir. 2010), *overruled on other grounds by Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012).

Between 2022 and 2024, Block filed materially false and misleading proxy statements to solicit approval for director election and compensation.  ¶248.  Each of the Current Director Defendants served on the Board when the Proxy Statements were filed, and Dorsey signed each of them.  *Id.*  While the Proxy Statements purported to detail the Board's "oversight of the [Enterprise Risk Assessment] framework" and added that the "board of directors and its committees oversee risks associated with their respective areas of responsibility," they omitted material facts that the Company's compliance function was exposing the Company to risk, that the risk was materializing in the form of increased criminal activity on Cash App, and that the Board's oversight failed to prevent the Company from falsely inflating its transacting active numbers.  *See Countrywide*, 554 F. Supp. 2d at 1076-77 (finding plaintiffs stated Section 14(a) claim where proxy statements "assur[ed] shareholders that [the company's] executive compensation policies and programs were,

in fact, effective" when they "were no longer functioning properly because they gave Defendants an illicit incentive that was not aligned with shareholder interests").

Defendants' reliance on cases holding misleading statements in proxies inactionable because they only resulted in the election of directors who mismanaged the company is misplaced. *See* MTD at 24-25. While courts in this district have dismissed Section 14(a) claims alleging a failure to disclose facts showing a board's mismanagement, the same is not true where, as here, a "Section 14(a) claim is based not only on mismanagement and breach of fiduciary duty, but also on fraud." *In re Wells Fargo & Co. S'holder Derivative Litig.*, 282 F. Supp. 3d 1074, 1102-03 (N.D. Cal. 2017) (finding that the concealment of the company's fraud supported a Section 14(a) claim because, "had this information been disclosed, shareholders would not have voted to re-elect Board members, approve executive compensation packages, and reject an independent board chairman.")

### 3.    The Complaint States a Section 29(b) Claim.

"Section 29(b) renders voidable '[e]very contract made in violation of any provision of [the securities laws] or of any rule or regulation thereunder, and every contract . . . the performance of which involves [such a] violation.'" *Facebook, Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1039 (9th Cir. 2011) (quoting 15 U.S.C. § 78cc(b)). To void a contract under Section 29(b), an individual must establish that "(1) the contract involved a prohibited transaction; (2) he is in contractual privity with [the entity]; and (3) [the individual] is in the class of persons that the securities acts were designed to protect." *In re Asyst Techs., Inc. Derivative Litig.*, 2008 WL 4891220, at *9 (N.D. Cal. Nov. 12, 2008) (citation omitted). The Individual Defendants violated Sections 10(b) and 14(a) of the Exchange Act when entering into contracts with Block for their compensation as directors and officers. ¶351. Those contracts are voidable under Section 29(b).

Defendants contend that they are immune to Section 29(b) liability because Plaintiff has not pled a primary Exchange Act violation. *See* MTD at 25. For the reasons discussed above, Defendants are wrong. *Supra* at III.B.1-2. Defendants also argue for dismissal of Plaintiff's Section 29(b) claim because the Complaint purportedly does not identify specific contracts to be

rescinded.  *See* MTD at 25.  But courts in this district have disclaimed any need for a plaintiff to allege "which contracts should be rescinded, the contents of the contracts, or why any contracts should be rescinded."  *Wells Fargo*, 282 F. Supp. 3d at 1106 (quoting *Asyst*, 2008 WL 4891220, at *9).  Under this authority, Plaintiffs have stated a plausible Section 29(b) claim.

## CONCLUSION

For the foregoing reasons, the Motion should be denied in its entirety.

Respectfully submitted,

Dated: September 11, 2025

**BLOCK & LEVITON LLP**
*/s/ Jason M. Leviton*
Jason M. Leviton (*pro hac vice*)
Nathan Abelman (*pro hac vice*)
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600
jason@blockleviton.com
nathan@blockleviton.com

Jacob A. Walker (SBN 271217)
**BLOCK & LEVITON LLP**
400 Concar Drive
San Mateo CA 94402
(650) 781-0025
jake@blockleviton.com

Lindsay K. Faccenda (*pro hac vice*)
**BLOCK & LEVITON LLP**
222 Delaware Avenue
Suite 1120
Wilmington, DE 19801
(302) 499-3600
lindsay@blockleviton.com

**HACH ROSE SCHIRRIPA & CHEVERIE LLP**
Daniel B. Rehns (*pro hac vice*)
Scott R. Jacobsen (*pro hac vice*)
John W. Baylet (*pro hac vice*)
112 Madison Avenue, 10th Floor
New York, New York 10016
(212) 213-8311
drehns@hrsclaw.com
sjacobsen@hrsclaw.com
JBaylet@hrsclaw.com

*Co-Lead Counsel for Plaintiffs*